220 F.2d 906
 Jack LANSKY, Appellant,
v.
Joseph SAVORETTI, District Director of the United States Immigration and Naturalization Service, Miami, Florida, Appellee.
Sylvia SHANDLOFF, Appellant,
v.
Joseph SAVORETTI, District Director of the United States Immigration and Naturalization Service, Miami, Florida, Appellee.
 No. 14982.
 No. 15277.
 United States Court of Appeals, Fifth Circuit.
 March 30, 1955.
 
 David W. Walters, Walters, Moore & Costanzo, Miami, Fla., for appellants.
 James L. Guilmartin, U. S. Atty., Miami, Fla., Douglas P. Lillis, Acting Dist. Counsel, Miami Dist., United States Immigration and Naturalization Service, Miami, for appellee.
 Before HUTCHESON, Chief Judge, TUTTLE, Circuit Judge, and DAWKINS, District Judge.
 HUTCHESON, Chief Judge.
 
 
 1
 These appeals, prosecuted, lodged, and argued by the same counsel, are from orders of Judge Holland, United States District Judge for the Southern District of Florida, holding valid and authorized by law subpoenas, issued by an immigration officer, under Section 235(a) of the Immigration and Nationality Act of 1952, for the discovery of evidence to support a suit for denaturalization, as provided in Section 340 of the 1952 Act, 8 U.S.C.A. § 1451.
 
 
 2
 As was the case in In re Barnes, 2d Cir., 219 F.2d 137,[1] the question raised by these two appeals is whether Section 235(a)[2] of the Immigration and Nationality Act of 1952, the McCarran-Walter Act, 66 Stat. 163, 198-9, 8 U.S.C.A. § 1225(a), authorizes an officer of the Immigration and Naturalization Service to issue a subpoena requiring a naturalized citizen to testify, in an inquiry seeking to determine if "good cause" exists for the commencement of proceedings to revoke the order admitting such person to citizenship.[3]
 
 
 3
 When the brief for appellant Lansky was filed, the decisions of the district courts in the cases of Falcone and Oddo, Note 1, supra, holding unauthorized and invalid immigration subpoenas issued as here and in the case of In re Minker,[4] holding to the contrary, had not been reversed on appeal, Appellant, therefore, deprecating the Minker decision and relying strongly on the Falcone and Oddo decisions, devoted most of his brief to quotations from them and to the confident assertion of their correctness.
 
 
 4
 Before the time, however, that the brief in the Shandloff case was due, the Court of Appeals for the Third Circuit, quoting with approval from the decision in the Falcone case, had on the appeal in Minker's case held that the subpoena was unauthorized and invalid and had reversed the district court's decision in the case, but on a very narrow ground.
 
 
 5
 Stating "Section 235(a) provides that `* * * any immigration officer shall have power to require by subpoena the attendance and testimony of witnesses before immigration officers * * *', it also makes this power applicable to the obtaining of testimony `concerning any matter which is material and relevant to the enforcement of this act and the administration of the service * * *'," the court went on to say: "Certainly the proceeding In re Minker was such a matter. The doubtful question is whether Abraham Minker in relation to `In re Minker' is a `witness' within the meaning of Sec. 235(a)."
 
 
 6
 This question posed, the court, upon reasons which seem to us to be wanting in substance and to run counter not only to the clearly indicated scope and purpose of the act but to its carefully chosen and expressed language, proceeded to hold that the granted power to subpoena witnesses did not support the subpoena of Minker because, and only because, Minker being the party involved in the contemplated denaturalization suit, was not a "witness" within the meaning and intent of the statute. The Shandloff brief, therefore, was directed mainly to quotations from the opinion of the Third Circuit in Minker's case and to acclaiming this succor and assistance from an unexpected quarter as the opinion of a "Daniel come to judgment" and an opinion to end all opinions on the subject.
 
 
 7
 Unfortunately for both appellants, however, by the time for filing appellee's brief in this court, the Court of Appeals for the Second Circuit had written its opinion in In re Barnes, reversing the district court decisions in the Falcone and Oddo cases, and in effect agreeing with the decision of the district court and disagreeing with that of the Court of Appeals for the Third Circuit in In re Minker.
 
 
 8
 When, then, the matter comes to us for decision, the moving fingers in the Second and Third Circuit have ceased to write, decision making there has apparently come to an end, and we are presented with a fait juridique and with a clear choice of aligning ourselves with the Third or with the Second Circuit, or with neither.
 
 
 9
 So circumstanced, we do not hesitate to declare that we regard the reasoning and decision of the Third Circuit in the Minker case as too narrowly based and as without support in the plain language of the statute under the applicable principles of statutory construction. No mention is made in the opinion of, no attention is paid to, the broad policy considerations plainly to be seen on the face of the Immigration and Nationality Act of 1952, no effect is accorded to the general purpose manifested in both the language and the history of the act. There is only, with deference, a quite dry as dust and brittle interpretation of a single word in a broadly comprehensive act, with the effect of greatly impairing its scope and efficiency and the further effect of defeating its underlying purpose, to discover those who have taken false advantage of the naturalization privilege and to deprive them of the fruits of their fraud.
 
 
 10
 On the other hand, we find ourselves in accord not only with the conclusion announced in the opinion of the Court of Appeals for the Second Circuit but, generally speaking, with the reasons given in that opinion. The district judge in the Minker case correctly pointed out that it is a far cry in time and a farther one in substance from the days of administrative exuberance,[5] to put it mildly, and from Jones v. Securities and Exchange Commission, 298 U.S. 1, 56 S.Ct. 654, 80 L.Ed. 1015, with its organlike denunciations of, and Morgan v. U. S., 298 U.S. 468, 56 S.Ct. 906, 80 L.Ed. 1288, with its milder preachments against administrative usurpation and absolutism, to the decision in United States v. Morton Salt Co., 338 U.S. 632, 70 S.Ct. 357, 94 L.Ed. 401, and to the present, when the Administrative Procedure Act,[6] 5 U.S.C.A. § 1005,[7] and the decisions giving it effect, have brought substantially all administrative actions and their review within the compass of the Administro-Judicial Process.[8]
 
 
 11
 Taking the statute up, then, to consider it with the view to determining its reach and scope, and considering it as a fully integrated act, we think it may not be doubted that the fear of administrative abuse of power is not a sufficient basis for limiting, within the narrow confines proposed by appellant, the generality and comprehensiveness of the language employed to grant the power claimed and exerted here. We think that, construing the statute under the ordinary canons of statutory construction, it cannot be successfully claimed, that subpoena power is lacking, and that the judgment of the district court affirming the exercise of that power was wrong.
 
 
 12
 As to the secondary point in the case, that the subpoena is too broad and that its exercise may be oppressive and, therefore, unconstitutional, it is sufficient to say that this defense falls with the general defense of want of power. For there is nothing in the subpoena which authorizes it to, or indicates that it will, be oppressively exerted. Certainly it cannot be claimed that it is a mere fishing expedition for it is directed to reaching, and seeks only to reach, evidence in connection with a definite and single issue, whether grounds exist to support a claim for denaturalization. As pointed out in the Barnes case and in the many cases[9] we, and other courts, have written in connection with the use and abuse of the subpoena power, the issuance of the subpoena is but a step in the inquiry. Neither the issuance of, nor compliance with, it in any manner takes away or impairs the constitutional rights of the person to be examined. If at any time during the examination the person subpoenaed feels or fears that his constitutional rights are being, or will be invaded by particular questions, he has the right to stand upon them and to invoke the protection of the courts.
 
 
 13
 In no doubt that the questions presented in these appeals were correctly answered by the court below, we affirm his judgments.
 
 
 14
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 Decided 1-10-55, reversing the decisions of the United States District Courts for the Northern and Southern Districts of New York, reported as Application of Barnes (In re Falcone), D.C., 116 F. Supp. 464, decided 11-20-53, and In re Oddo, D.C., 117 F.Supp. 323, decided 12-30-53
 
 
 [2]
 "Sec. 235. (a) The inspection, other than the physical and mental examination, of aliens (including alien crewmen) seeking admission or readmission to, or the privilege of passing through the United States shall be conducted by immigration officers, except as otherwise provided in regard to special inquiry officers. All aliens arriving at ports of the United States shall be examined by one or more immigration officers at the discretion of the Attorney General and under such regulations as he may prescribe. Immigration officers are hereby authorized and empowered to board and search any vessel, aircraft, railway car, or other conveyance, or vehicle in which they believe aliens are being brought into the United States. The Attorney General and any immigration officer, including special inquiry officers, shall have power to administer oaths and to take and consider evidence of or from any person touching the privilege of any alien or person he believes or suspects to be an alien to enter, reenter, pass through, or reside in the United States or concerning any matter which is material and relevant to the enforcement of this Act and the administration of the Service, and, where such action may be necessary, to make a written record of such evidence. Any person coming into the United States may be required to state under oath the purpose or purposes for which he comes, the length of time he intends to remain in the United States, whether or not he intends to remain in the United States permanently and, if an alien, whether he intends to become a citizen thereof, and such other items of information as will aid the immigration officer in determining whether he is a national of the United States or an alien and, if the latter, whether he belongs to any of the excluded classes enumerated in section 212. The Attorney General and any immigration officer, including special inquiry officers, shall have power to require by subpena the attendance and testimony of witnesses before immigration officers and special inquiry officers and the production of books, papers, and documents relating to the privilege of any person to enter, reenter, reside in, or pass through the United States or concerning any matter which is material and relevant to the enforcement of this Act and the administration of the Service, and to that end may invoke the aid of any court of the United States. Any United States district court within the jurisdiction of which investigations or inquiries are being conducted by an immigration officer or special inquiry officer may, in the event of neglect or refusal to respond to a subpena issued under this subsection or refusal to testify before an immigration officer or special inquiry officer, issue an order requiring such persons to appear before an immigration officer or special inquiry officer, produce books, papers, and documents if demanded, and testify, and any failure to obey such order of the court may be punished by the court as a contempt thereof."
 
 
 [3]
 "Sec. 340. (a) It shall be the duty of the United States district attorneys for the respective districts, upon affidavit showing good cause therefor, to institute proceedings in any court specified in subsection (a) of section 310 of this title in the judicial district in which the naturalized citizen may reside at the time of bringing suit, for the purpose of revoking and setting aside the order admitting such person to citizenship and canceling the certificate of naturalization on the ground that such order and certificate of naturalization were procured by concealment of a material fact or by willful misrepresentation, and such revocation and setting aside of the order admitting such person to citizenship and such canceling of certificate of naturalization shall be effective as of the original date of the order and certificate, respectively * * *. If the naturalized citizen does not reside in any judicial district in the United States at the time of bringing such suit, the proceedings may be instituted in the United States District Court for the District of Columbia or in the United States district court in the judicial district in which such person last had his residence."
 
 
 [4]
 United States District Court for the Eastern District of Pennsylvania, decided 11-25-53, reported 118 F.Supp. 264
 
 
 [5]
 Cf. "Judging as Administration, Administration as Judging", Texas Law Review, Nov., 1942. Vol. 21
 
 
 [6]
 Cf. "New Instruments of Public Power," Alexander F. Morrison Lectureship Foundation, Proceedings of the 1946 Annual Meeting, California State Bar
 
 
 [7]
 "An Act To improve the administration of justice by prescribing fair administrative procedure", Chapt. 324, Public Law 404, Laws of the 79th Congress, Second Session 1946, 60 Stat. 237
 
 
 [8]
 "An administro-judicial process, beginning with administrative adjudication of the facts and ending with a judicial adjudication of the law, both as completely aspects of one adjudicative process as are the adjudication of the facts by trial judge or jury and the adjudication of the law on appeal." Judging as Administration, Administration as Judging, note 5, supra
 Cf. "Under such statutes, this court does not function as a tribunal, exterior to the statutory administrative scheme, whose jurisdiction is invoked on constitutional grounds, to protect the applicant against the failure of the statute to provide due process. It functions as the tribunal of last resort, set up in the statute itself, for the correction of errors of law committed, and not corrected, in the course of the administrative procedure. * * *" Leebern v. U. S., 5 Cir., 124 F.2d 505, at page 507; U. S. v. Morgan, 307 U. S. 183, at page 191, 59 S. Ct. 795, 83 L.Ed. 1211.
 
 
 [9]
 N. L. R. B. v. Anchor Rome Mills, Inc., 5 Cir., 197 F.2d 447; Jackson Packing Co. v. N. L. R. B., 5 Cir., 204 F.2d 842; N. L. R. B. v. Barrett Co., 7 Cir., 120 F.2d 583 at page 586