## UNITED STATES *v.* MINKER.

NO. 35.

Argued November 14, 1955.—Decided January 16, 1956.

*Marvin E. Frankel* argued the cause for the United States in No. 35 and for respondent in No. 47. With him on the briefs were *Solicitor General Sobeloff, Assistant Attorney General Olney, Beatrice Rosenberg* and *Carl H. Imlay.*

*Jacob Kossman* argued the cause and filed a brief for respondent in No. 35.

*George Morris Fay* argued the cause for petitioners in No. 47. With him on a brief was *John P. Burke. Anthony S. Falcone* also filed a brief for petitioners in No. 47.

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

Because of conflicting constructions by the Courts of Appeals for the Second and Third Circuits of § 235 (a) of the Immigration and Nationality Act of 1952, 66 Stat. 163, 198, we brought these cases here. 349 U. S. 904; 349 U. S. 927. They were heard in sequence, and, since minor differences in their facts are irrelevant to the problems now before us, they may be disposed of in one opinion.

Section 235 (a) [1] provides that any immigration officer "shall have power to require by subpena the attendance

---

[1] Section 235 (a) in full provides: "The inspection, other than the physical and mental examination, of aliens (including alien crewmen) seeking admission or readmission to, or the privilege of passing through the United States shall be conducted by immigration officers, except as otherwise provided in regard to special inquiry officers. All aliens arriving at ports of the United States shall be examined by one or more immigration officers at the discretion of the Attorney General and under such regulations as he may prescribe. Immigration officers are hereby authorized and empowered to board and search any vessel, aircraft, railway car, or other conveyance, or vehicle in which they believe aliens are being brought into the United States. The Attorney General and any immigration officer, including special inquiry officers, shall have power to administer oaths and to take and consider evidence of or from any person touching the privilege of any alien or person he believes or suspects to be an alien to enter, reenter, pass through, or reside in the United States or concerning any matter which is material and relevant to the enforcement of this Act and the administration of the Service, and, where such action may be necessary, to make a written record of such evidence. Any person coming into the United States may be required to state

and testimony of witnesses before immigration officers . . . relating to the privilege of any person to enter, reenter, reside in, or pass through the United States or concerning any matter which is material and relevant to the enforcement of this Act and the administration of the Service, and to that end may invoke the aid of any court of the United States." The controlling issue presented by these cases is whether this section empowers an immigration officer to subpoena a naturalized citizen who is the subject of an investigation by the Service, where the purpose of the investigation is to determine if good cause exists for the institution of denaturalization proceedings under § 340 (a) of the Act.[2]

under oath the purpose or purposes for which he comes, the length of time he intends to remain in the United States, whether or not he intends to remain in the United States permanently and, if an alien, whether he intends to become a citizen thereof, and such other items of information as will aid the immigration officer in determining whether he is a national of the United States or an alien and, if the latter, whether he belongs to any of the excluded classes enumerated in section 212. The Attorney General and any immigration officer, including special inquiry officers, shall have power to require by subpena the attendance and testimony of witnesses before immigration officers and special inquiry officers and the production of books, papers, and documents relating to the privilege of any person to enter, reenter, reside in, or pass through the United States or concerning any matter which is material and relevant to the enforcement of this Act and the administration of the Service, and to that end may invoke the aid of any court of the United States. Any United States district court within the jurisdiction of which investigations or inquiries are being conducted by an immigration officer or special inquiry officer may, in the event of neglect or refusal to respond to a subpena issued under this subsection or refusal to testify before an immigration officer or special inquiry officer, issue an order requiring such persons to appear before an immigration officer or special inquiry officer, produce books, papers, and documents if demanded, and testify, and any failure to obey such order of the court may be punished by the court as a contempt thereof."

[2] Section 340 (a) provides: "It shall be the duty of the United States district attorneys for the respective districts, upon affidavit

In No. 35, the District Director of the Immigration and Naturalization Service at Philadelphia, in accordance with § 340.11 of the Service's regulations,[3] instituted an investigation of respondent for the aforementioned purpose. In furtherance of this inquiry into the legality of

showing good cause therefor, to institute proceedings in any court specified in subsection (a) of section 310 of this title in the judicial district in which the naturalized citizen may reside at the time of bringing suit, for the purpose of revoking and setting aside the order admitting such person to citizenship and canceling the certificate of naturalization on the ground that such order and certificate of naturalization were procured by concealment of a material fact or by willful misrepresentation, and such revocation and setting aside of the order admitting such person to citizenship and such canceling of certificate of naturalization shall be effective as of the original date of the order and certificate, respectively: *Provided,* That refusal on the part of a naturalized citizen within a period of ten years following his naturalization to testify as a witness in any proceeding before a congressional committee concerning his subversive activities, in a case where such person has been convicted of contempt for such refusal, shall be held to constitute a ground for revocation of such person's naturalization under this subsection as having been procured by concealment of a material fact or by willful misrepresentation. If the naturalized citizen does not reside in any judicial district in the United States at the time of bringing such suit, the proceedings may be instituted in the United States District Court for the District of Columbia or in the United States district court in the judicial district in which such person last had his residence."

[3] 8 CFR § 340.11 provides: *"Investigation and report.* Whenever it appears that any grant of naturalization may have been procured by concealment of a material fact or by wilful misrepresentation, the facts shall be reported to the district director having jurisdiction over the naturalized person's last known place of residence. If the district director is satisfied that a prima facie showing has been made that grounds for revocation exist, he shall cause an investigation to be made and report the facts in writing to the Commissioner with a recommendation as to whether revocation proceedings should be instituted. If it appears that naturalization was procured in violation of section 1425 of Title 18 of the United States Code, the facts in regard thereto may be presented by the district director to the appropriate United States Attorney for possible criminal prosecution."

Minker's naturalization the Director subpoenaed him to give testimony at the offices of the Service. Prior to the required date of his appearance, he moved to quash the subpoena in the United States District Court for the Eastern District of Pennsylvania upon the ground, *inter alia,* that it was unauthorized by the Act. This motion was denied, *In re Minker,* 118 F. Supp. 264, and no appeal was taken. When respondent thereafter failed to obey the subpoena, the District Court, on application of the District Director, ordered respondent to appear before the Service and testify. He disregarded this order. After a hearing he was adjudged in contempt for so doing and fined $500. The Court of Appeals for the Third Circuit reversed, holding that while the power to subpoena under § 235 (a) was available for investigations directed toward denaturalization proceedings, respondent as a putative defendant in such a proceeding was not a "witness" within the meaning of the section, and the Service was, therefore, without power to subpoena him.[4] 217 F. 2d 350.

In No. 47, each petitioner was served with a subpoena issued by the officer in charge of the Immigration and Naturalization Service at Syracuse, New York. The subpoenas commanded petitioners' appearance and testimony, and required them to produce specified documents. They appeared with documents as ordered, but refused to be sworn or to testify. Thereupon an application for an order of compliance was made by the Service in the United States District Court for the Northern District of New York; but the court, denying the Service's authority, refused to compel petitioners to appear and give testimony. 116 F. Supp. 464. On appeal, to the Court of

---

[4] The question whether respondent was required to obey the order of the District Court irrespective of that court's power under § 235 (a) has not been raised. See *United States* v. *United Mine Workers of America,* 330 U. S. 258.

Appeals for the Second Circuit, this judgment was reversed. 219 F. 2d 137. The court held that § 235 (a) of the Act permitted the immigration officer to subpoena the petitioners in furtherance of the Service's investigation of them under § 340.11 of the regulations. The decision assumed, although the court did not discuss the question, that each petitioner, even though a subject of investigation, was a "witness" within the meaning of § 235 (a).[5]

This brings us to an examination of the scope of § 235 (a). It had its genesis in § 16 of the Immigration Act of 1917, 39 Stat. 874, 885, which dealt with the examination of entering aliens by the Immigration Service. With respect to subpoenas the section provided: "Any commissioner of immigration or inspector in charge shall also have power to require by subpoena the attendance and testimony of witnesses before said inspectors and the production of books, papers, and documents touching the right of any alien to enter, reenter, reside in, or pass through the United States, and to that end may invoke the aid of any court of the United States . . . ." Obviously, this provision strictly defined the purposes for which officers of the Service could subpoena witnesses. It did not give them power to issue subpoenas as aids in investigating potential naturalization offenses.

The 1952 Act in § 235 (a) retained the substance of this language in § 16. But the word "alien" was changed to "person," and additional language extended the subpoena power to "any matter which is material and relevant to the enforcement of this Act and the administration of the Service." If the additional clause, following the portion "relating to the privilege of any person to enter, reenter, reside in, or pass through the United States," had merely read "and any other matter which is material and

---

[5] The Court of Appeals for the Fifth Circuit has taken the same view. *Lansky et al.* v. *Savoretti,* 220 F. 2d 906.

relevant," the doctrine of *ejusdem generis* would appropriately be invoked to limit the subpoena power to an investigation pertaining to questions of admission and deportation. The comprehensive addition of the clause "or concerning any matter which is material and relevant to the enforcement of this Act and the administration of the Service," precludes such narrowing reading. "Act" encompasses the full range of subjects covered by the statute. The Immigration and Nationality Act of 1952 brought together in one statute the previously atomized subjects of immigration, nationality and naturalization. The unqualified use of the word "Act" in § 235 (a), if read as ordinary English, embraces all of these subjects even though § 235 (a) is itself in the immigration title of the statute. But "the title of a statute and the heading of a section cannot limit the plain meaning . . . ." *Brotherhood of Railroad Trainmen* v. *Baltimore & Ohio R. Co.*, 331 U. S. 519, 528–529. Throughout this statute the word "Act" is given its full significance. . The word embraces the entire statute.[6] On the other hand, when

---

[6] *E. g.*, § 215 (g): "Passports, visas, reentry permits, and other documents required for entry under this Act may be considered as permits to enter for the purposes of this section." § 241 (a)(2): "Any alien in the United States . . . shall, upon the order of the Attorney General, be deported who—entered the United States without inspection or at any time or place other than as designated by the Attorney General or is in the United States in violation of this Act or in violation of any other law of the United States." § 290 (a): "There shall be established in the office of the Commissioner for the use of the security and enforcement agencies of the Government of the United States, a central index, which shall contain the names of all aliens heretofore admitted to the United States, or excluded therefrom, insofar as such information is available from the existing records of the Service, and the names of all aliens hereafter admitted to the United States, or excluded therefrom, the names of their sponsors of record, if any, and such other relevant information as the Attorney General shall require as an aid to the proper enforcement of this Act."

only a particular title is referred to, it is designated as such, and when the reference is to a section, that word is employed.[7]   No justification appears for treating "Act" in § 235 (a) as meaning "section."   Thus far the Second and Third Circuits are in agreement.

We come then to the question upon which the two Courts of Appeals part ways in their construction of § 235 (a), namely, whether Salvatore and Joseph Falcone in the one case and Abraham Minker in the other, although each the subject of a denaturalization investigation under § 340.11 of the regulations, were "witnesses" within the meaning of the power given to "any immigration officer" to require "by subpoena the attendance and testimony of witnesses" before immigration officers.

If the answer to the question merely depended upon whether, as a matter of allowable English usage, the word "witness" may fairly describe a person in the position of Minker and the Falcones, it could not be denied that the word could as readily be deemed to cover persons in their position as not.   In short, the word is patently ambiguous: it can fairly be applied to anyone who gives testimony in a proceeding, although the proceeding immediately or potentially involves him as a party, or it may be restricted to the person who gives testimony in another's case.

---

[7] *E. g.*, § 284: "Nothing contained in this title shall be construed so as to limit, restrict, deny, or affect the coming into or departure from the United States of an alien member of the Armed Forces of the United States who is in the uniform of, or who bears documents identifying him as a member of, such Armed Forces, and who is coming to or departing from the United States under official orders or permit of such Armed Forces: *Provided,* That nothing contained in this section shall be construed to give to or confer upon any such alien any other privileges, rights, benefits, exemptions, or immunities under this Act, which are not otherwise specifically granted by this Act."

It is pertinent to note the breadth of § 235 (a) not only with respect to the type of investigation in which a subpoena may be issued ("any matter which is material and relevant to the enforcement of this Act"), but also with respect to the member of the Service empowered to issue it. The power is granted "any immigration officer," who in turn is defined in § 101 (a)(18) of the Act as "any employee or class of employees of the Service or of the United States designated by the Attorney General, individually or by regulation, to perform the functions of an immigration officer specified by this Act or any section thereof." This extensive delegated authority reinforces the considerations inherent in the nature of the power sought to be exercised that make for a restrictive reading of the Janus-faced word "witness." The subpoena power "is a power capable of oppressive use, especially when it may be indiscriminately delegated and the subpoena is not returnable before a judicial officer. . . . True, there can be no penalty incurred for contempt before there is a judicial order of enforcement. But the subpoena is in form an official command, and even though improvidently issued it has some coercive tendency, either because of ignorance of their rights on the part of those whom it purports to command or their natural respect for what appears to be an official command, or because of their reluctance to test the subpoena's validity by litigation." *Cudahy Packing Co., Ltd.* v. *Holland,* 315 U. S. 357, 363–364.

These concerns, relevant to the construction of this ambiguously worded power, are emphatically pertinent to investigations that constitute the first step in proceedings calculated to bring about the denaturalization of citizens. See *Schneiderman* v. *United States,* 320 U. S. 118; *Baumgartner* v. *United States,* 322 U. S. 665. This may result in "loss of both property and life; or of all that makes life worth living." *Ng Fung Ho* v. *White,* 259 U. S. 276,

284. In such a situation where there is doubt it must be resolved in the citizen's favor. Especially must we be sensitive to the citizen's rights where the proceeding is nonjudicial because of "[t]he difference in security of judicial over administrative action . . . ." *Ng Fung Ho* v. *White, supra,* at 285.

These considerations of policy, which determined the Court's decisions in requiring judicial as against administrative adjudication of the issue of citizenship in a deportation proceeding and those defining the heavy criterion of proof to be exacted by the lower courts from the Government before decreeing denaturalization, are important guides in reaching decision here. They give coherence to law and are fairly to be assumed as congressional presuppositions, unless by appropriate explicitness the lawmakers make them inapplicable. Cf. *Bell* v. *United States,* 349 U. S. 81, 83. It does not bespeak deprecation of official zeal, nor does it bring into question disinterestedness, to conclude that compulsory *ex parte* administrative examinations, untrammelled by the safeguards of a public adversary judicial proceeding, afford too ready opportunities for unhappy consequences to prospective defendants in denaturalization suits.

These general considerations find specific reinforcement in the language of other provisions of the Act, wherein the person who is the subject of an investigation is referred to with particularity. The most striking example of this is to be found in § 335 and its legislative history which pertains to the investigation of an alien who petitions for naturalization. Section 335 (b) provides: "The Attorney General shall designate employees of the Service to conduct preliminary examinations upon petitions for naturalization . . . . For such purposes any such employee so designated is hereby authorized to take testimony concerning any matter touching or in any way affecting the admissibility of any petitioner for naturali-

zation, to administer oaths, including the oath of the petitioner for naturalization and the oaths of petitioner's witnesses to the petition for naturalization, and to require by subpena the attendance and testimony of witnesses, including petitioner . . . ." Contrast this with § 335 (b)'s predecessor, § 333 (a) of the Nationality Act of 1940, 54 Stat. 1137, 1156: ". . . any such designated examiner is hereby authorized to take testimony concerning any matter touching or in any way affecting the admissibility of any petitioner for naturalization, to subpena witnesses, and to administer oaths, including the oath of the petitioner to the petition for naturalization and the oath of petitioner's witnesses." [8] Other examples of Congress' careful differentiation between a witness who is not the subject of an investigation and the person who is, may be found in §§ 236 (a),[9] 242 (b)[10] and 336 (d)[11] of the 1952 Act.

---

[8] "While the Nationality Act [§ 333 (a) of the 1940 Act] provides for subpena of witnesses at a preliminary [naturalization] hearing and for calling of witnesses in any naturalization proceedings in court, specific provision is not made for subpenaing the petitioner. The subcommittee feels that the proposed bill should contain the requirement that the petitioner be required to attend hearings and is so recommending." S. Rep. No. 1515, 81st Cong., 2d Sess. 739.

[9] Section 236 (a) provides: "A special inquiry officer shall conduct proceedings under this section, administer oaths, present and receive evidence, and interrogate, examine, and cross-examine the alien or witnesses."

[10] Section 242 (b) provides: "A special inquiry officer shall conduct proceedings under this section to determine the deportability of any alien, and shall administer oaths, present and receive evidence, interrogate, examine, and cross-examine the alien or witnesses, and, as authorized by the Attorney General, shall make determinations, including orders of deportation."

[11] Section 336 (d) provides: "The Attorney General shall have the right to appear before any court in any naturalization proceedings for the purpose of cross-examining the petitioner and the witnesses produced in support of the petition concerning any matter touching

All these considerations converge to the conclusion that Congress has not provided with sufficient clarity that the subpoena power granted by § 235 (a) extends over persons who are the subject of denaturalization investigations; therefore Congress is not to be deemed to have done so impliedly. Since this is so, we are not called upon to consider whether Congress may empower an immigration officer to secure evidence, under the authority of a subpoena, from a citizen who is himself the subject of an investigation directed toward his denaturalization. The judgment in No. 35 is affirmed; in No. 47, the judgment is reversed.

*Affirmed and reversed respectively.*

Mr. Justice Black, concurring.

The respondent Minker is a naturalized citizen of the United States.[1] He was subpoenaed by an immigration officer to appear and give testimony as a "witness." But Minker was not to be a witness within the traditional meaning of that word, that is, one who testifies in a court proceeding or in a public quasi-judicial hearing of some kind. The immigration officer summoning Minker was not a judge or "grand jury" of any kind, nor was he at the time acting in any quasi-judicial capacity. Cf. *In re Oliver,* 333 U. S. 257. He was acting under his broad power as a law enforcement officer to follow up clues and find information that might be useful in later civil or criminal prosecutions brought against persons suspected

---

or in any way affecting the petitioner's right to admission to citizenship, and shall have the right to call witnesses, including the petitioner, produce evidence, and be heard in opposition to, or in favor of, the granting of any petition in naturalization proceedings."

[1] Minker is respondent in No. 35. He and the petitioners in No. 47, Salvatore and Joseph Falcone, raise the same questions, and what I say about Minker's case applies also to that of the Falcones.

of violating the immigration and naturalization laws. See, *e. g.*, § 287, Immigration and Nationality Act, 66 Stat. 233, 8 U. S. C. § 1357; 8 CFR §§ 287.1–287.5. The object in summoning Minker was to interrogate him in the immigration officer's private chambers to try to elicit information "relating to the possible institution of proceedings seeking the revocation of . . . [Minker's] naturalization . . . ." Information so obtained might be used under some circumstances in court to take away Minker's American citizenship or convict him of perjury or some other crime.[2] Thus the capacity in which this immigration officer was acting was precisely the same as that of a policeman, constable, sheriff, or Federal Bureau of Investigation agent who interrogates a person, perhaps himself a suspect, in connection with murder or some other crime. Apparently Congress has never even attempted to vest FBI agents with such private inquisitorial power. Indeed, this Court has construed congressional enactments as designed to safeguard persons against compulsory questioning by law enforcement officers behind closed doors. *McNabb* v. *United States,* 318 U. S. 332; *Upshaw* v. *United States,* 335 U. S. 410. And we have frequently set aside state criminal convictions as a denial of due process of law because of coercive questioning of suspects by public prosecutors and other law enforcement officers in their official chambers. See, *e. g., Watts* v. *Indiana,* 338 U. S. 49; *Harris* v. *South Carolina,* 338 U. S. 68; *Chambers* v. *Florida,* 309 U. S. 227. Yet power of the Attorney General and immigration officers to compel persons, including suspects, to appear and subject themselves

---

[2] See § 348, 66 Stat. 267, 8 U. S. C. § 1459; 18 U. S. C. § 1621. See also *Gonzales* v. *Landon,* 350 U. S. 920, reversing 215 F. 2d 955. But see *Boyd* v. *United States,* 116 U. S. 616; majority and dissenting opinions in *Feldman* v. *United States,* 322 U. S. 487; *Adams* v. *Maryland,* 347 U. S. 179.

to questioning by law enforcement officers in their private chambers is precisely what the Department of Justice claims here. This is no less true because a federal judge must be called on to "aid" the immigration officer in subjecting a summoned person to questioning. § 235 (a), 66 Stat. 198, 8 U. S. C. § 1225 (a). For after a court order, as before, the person summoned must go to an immigration officer's private chambers for questioning by him, out of which may come a prosecution against the "witness" for perjury or some other crime. A purpose to subject aliens, much less citizens, to a police practice so dangerous to individual liberty as this should not be read into an Act of Congress in the absence of a clear and unequivocal congressional mandate. I think the Act relied on here by the Department of Justice should not be so read. I would hold that immigration officers are wholly without statutory authority to summon persons, whether suspects or not, to testify in private as "witnesses" in denaturalization matters. For this reason I concur in the Court's judgment in this case.

The Department of Justice finds the sweeping power it claims in § 235 of the Immigration and Nationality Act of 1952, 66 Stat. 163, 198, 8 U. S. C. §§ 1101, 1225. That Act is a comprehensive codification of laws relating to entry, exclusion, domestic control, deportation and naturalization of aliens; the Act also provides the controlling rules and procedures for denaturalizing naturalized citizens. Primary responsibility for administration and enforcement of the Act is vested in the Attorney General, acting chiefly through his subordinates in the Immigration and Naturalization Service. § 103, 66 Stat. 173, 8 U. S. C. § 1103.

This Court has drawn sharp and highly important distinctions between the constitutional power of Congress to bar and exclude aliens and congressional power to strip

citizens of their citizenship. Former cases have held that Congress has full power to bar or exclude aliens from the country. See, *e. g., United States* v. *Ju Toy,* 198 U. S. 253; *Harisiades* v. *Shaughnessy,* 342 U. S. 580; *Shaughnessy* v. *United States ex rel. Mezei,* 345 U. S. 206. But citizenship, whether acquired by birth or by naturalization, cannot be taken away without a judicial trial in which the Government carries a heavy burden. See, *e. g., Ng Fung Ho* v. *White,* 259 U. S. 276; *Baumgartner* v. *United States,* 322 U. S. 665; *Gonzales* v. *Landon,* 350 U. S. 920. Congress, apparently taking note of these basic distinctions, divided the Act into different "Titles" and "Chapters." Section 235, on which the Government relies here, appears in Chapter IV of Title II. Title II as a whole contains provisions relating to "Immigration" and Chapter IV of that Title contains the "Provisions Relating to Entry and Exclusion." It is in the context of Chapter IV that § 235 gives the Attorney General and immigration officers, "including special inquiry officers," broad power to subpoena and require testimony of "witnesses" as to "the privilege of any person to enter, reenter, reside in, or pass through the United States or concerning any matter which is material and relevant to the enforcement of this Act and the administration of the Service . . . ." I think that context indicates that § 235 was designed to apply only to the examination of "witnesses" by immigration officers in relation to "entry and exclusion" of aliens, and matters material and relevant to entry and exclusion. Such a reading makes the subpoena power given fit into the carefully devised pattern of Title II, which deals with aliens and immigration, not with naturalization or denaturalization. Even if limited to matters pertaining to the entry and exclusion of aliens, compulsory private examination of "witnesses" might be invalid. The broad powers here claimed by the

Attorney General and his immigration officers could be more nearly defended, if they can be defended at all, by confining use of the powers to the field of treatment of aliens, where this Court has said Congress has most power.

Limitation of the subpoena and investigatory powers in § 235 to matters relating to entry, control and exclusion of aliens is strengthened by consideration of Title III of the Act which covers "Nationality and Naturalization." That Title provides procedures for investigation and trial of naturalization and denaturalization cases, wholly adequate in themselves without reliance on the subpoena and examination powers of immigration officers under § 235. The naturalization and denaturalization procedures of Title III are not merely adequate, but are in a measure inconsistent with § 235 procedure. Looking first at naturalization procedure under §§ 332–336, 66 Stat. 252–258, 8 U. S. C. §§ 1443–1447, it appears that Congress with meticulous care provided a procedure for investigation of naturalization cases. These sections provide their own way for summoning and examining witnesses. Without mentioning immigration officers, the sections provide for investigations, etc., to be carried on by any employee of the Service or of the United States designated by the Attorney General. An examination under this Title is carried on by a public hearing at which an applicant for citizenship can produce his own witnesses.[3] The designated

---

[3] The Attorney General's regulations for the conduct of these examinations, 8 CFR §§ 335.11–335.13, also provide that the petitioner for naturalization may be represented by counsel and that the petitioner may cross-examine government witnesses. If petitioner is not represented by counsel, the hearing examiner must assist him in introducing his evidence. Furthermore the decision of the examiner may not be based on evidence which is not in the record or which would be inadmissible in judicial proceedings. Thus the regulations emphasize the difference between a subpoena to testify before a § 335 naturalization hearing officer and a subpoena to testify before a § 235

hearing examiner is given the power to subpoena witnesses by § 335 (b), 66 Stat. 255, 8 U. S. C. § 1446 (b), and the naturalization judge is authorized to compel compliance with the subpoena. After the hearing the examiner reports his findings and recommendations to the Attorney General. The views of the designated examiner, and of the Attorney General if in conflict, are then reported to the naturalization court for its consideration. All of this persuades me that reliance on the subpoena and private examination powers of immigration officers under § 235 would actually conflict with the public hearing procedure Congress and the Attorney General have provided for naturalization cases in §§ 332–335, 66 Stat. 252–257, 8 U. S. C. §§ 1443–1446, and 8 CFR §§ 335.11–335.13.

It seems even clearer that immigration officers' powers under § 235 are not applicable in denaturalization cases. Section 340 of Title III of the Act, 66 Stat. 260, 8 U. S. C. § 1451, provides for revocation of naturalization. Responsibility for initiating such cases is placed on *district attorneys* "upon affidavit showing good cause therefor . . . ." Many of the grounds for denaturalization are also grounds for felony prosecutions. Under these circumstances it is not surprising that Congress expressly placed responsibility for instituting denaturalization proceedings on district attorneys, leaving them to summon persons to appear as witnesses in the traditional manner before grand juries or courts. It would have been surprising had Congress attempted to authorize the Nation's chief prosecuting officer and his subordinates to compel a citizen to appear in government private offices to

---

immigration officer seeking to obtain evidence for criminal prosecution or deportation. And they show that naturalization procedures are completely independent from entry and exclusion procedures. Cf. §§ 235 (c), 236 (a), 292, 66 Stat. 199, 200, 235, 8 U. S. C. §§ 1225 (c), 1226 (a), 1362; 8 CFR §§ 235.15, 236.11–236.16.

answer questions in secret about that citizen's conduct, associations and beliefs. Some countries give such powers to their officials. It is to be hoped that this country never will.

Mr. Justice Douglas, concurring.

While I agree with the result reached by the Court, I do not think this case is comparable to those controversies that frequently rage over the scope of the investigative power in support of administrative action. Cf. *Cudahy Packing Co.* v. *Holland,* 315 U. S. 357, with *United States* v. *Morton Salt Co.,* 338 U. S. 632. Congress has provided a special judicial procedure which must be followed, if a citizen is denaturalized. That procedure is contained in § 340 of the Immigration and Nationality Act of 1952. 66 Stat. 163, 8 U. S. C. § 1451. It provides for canceling a certificate of naturalization on the ground that it was procured "by concealment of a material fact or by willful misrepresentation." § 340 (a). Suit may be brought by the United States Attorney in the District Court "upon affidavit showing good cause." *Id.* The citizen whose citizenship is challenged has 60 days "in which to make answer to the petition of the United States." § 340 (b). There is no pretrial administrative procedure provided in the section governing denaturalization. One can search § 340 in vain for any suggestion that the judicial procedure is supplemented by a pretrial procedure. So to hold would make the 60-day period for answer "empty words," as Judge Foley ruled in *Application of Barnes,* 116 F. Supp. 464, 469. As Judge Hastie, writing for the court below in the *Minker* case, said, the administrative pretrial procedure is not consistent with the safeguards which Congress has provided in the judicial proceedings. 217 F. 2d 350, 352. I agree with that view and would, therefore, read

§ 235 (a) to exclude witnesses who are potential defendants in § 340 cases.

There is another reason for reading the section narrowly. When we deal with citizenship we tread on sensitive ground. The citizenship of a naturalized person has the same dignity and status as the citizenship of those of us born here, save only for eligibility to the Presidency. He is a member of a community included within the protection of all the guarantees of the Constitution. Those safeguards would be imperiled if prior to the institution of the proceedings the citizen could be compelled to be a witness against himself and furnish out of his own mouth the evidence used to denaturalize him. I would require the Government to proceed with meticulous regard for the basic notions of Due Process which protect every vital right of the American citizen.