Joseph SHERMAN, Respondent, Appellant,

v.

James A. HAMILTON, Jr., District Director, Immigration and Naturalization Service, Petitioner, Appellee.

No. 5841.

United States Court of Appeals First Circuit.

Heard Oct. 6, 1961.

Decided Oct. 30, 1961.

Allan R. Rosenberg, Boston, Mass., for appellant.

James C. Heigham, Asst. U. S. Atty., Boston, Mass., with whom W. Arthur Garrity, Jr., U. S. Atty., Boston, Mass., was on the brief, for appellee.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

HARTIGAN, Circuit Judge.

This is an appeal from an order of the United States District Court for the District of Massachusetts entered May 12, 1961 upon application of appellee for the enforcement of an administrative subpoena under the provisions of § 235(a) of the Immigration and Nationality Act of 1952, 66 Stat. 163, 198, 8 U.S.C.A. § 1225(a).

Section 235(a) provides in its pertinent part that any immigration officer "shall have power to require by subpena the attendance and testimony of witnesses before immigration officers * * * relating to the privilege of any person to enter, reenter, reside in, or pass through the United States or concerning any matter which is material and relevant to the enforcement of this chapter and the administration of the Service, and to that end may invoke the aid of any court of the United States."

This case presents the question of whether § 235(a) empowers an immigration officer to subpoena as a "witness" an alien who is himself the subject of the investigatory proceedings and where the investigation is concededly an initiatory step to possible deportation proceedings against said alien.

On April 11, 1961 the District Director of the Immigration and Naturalization Service, Boston, Massachusetts,

caused a subpoena to be served upon appellant—an alien residing in the United States—directing him to appear before an investigator of the Immigration Service on April 18, 1961. The subpoena recited that the appellant was required to attend the hearing "to give testimony in connection with deportation proceeding being conducted under authority of the Immigration and Nationality Act relating to Joseph Sherman (appellant herein) concerning his privilege of entering, reentering, residing in or passing through the United States."

Appellant appeared in response to the subpoena and after answering certain preliminary questions relating to such matters as the date and place of his birth, the date of his initial entry into the United States in 1920 and the fact that neither he nor his parents had ever become American citizens, thereafter refused to answer substantially all of the questions put to him by the investigator. In the main these questions sought to determine whether the appellant, acting under an assumed name, had left the United States in 1937, traveled to Spain, and, while still utilizing this artifice, had, thereafter, returned to the United States in 1938. When the investigator initially sought to question him on this matter, appellant stated that: "I decline to answer on advice of counsel." Upon being asked by the investigator to indicate the specific ground upon which he based his refusal, he answered: "On all grounds that are available to me." The investigator, still attempting to crystallize the specific basis for appellant's refusal further queried: "By that do you mean that you decline also on the grounds of the Fifth Amendment?" Appellant replied: "Not necessarily. On all the grounds that are available to me." He maintained this position throughout the remainder of the questioning by use of the phrase "Same answer."

On April 24, 1961 the appellee acting under § 235(a) filed in the district court an application to enforce the administrative subpoena. This application sought an order directing appellant to appear and testify before the investigator on May 16, 1961. On April 24, 1961 the district court allowed an order returnable May 1, 1961 directing appellant to appear and show cause why he should not be required to answer the questions put to him on April 18, 1961. Following this hearing the district court issued an order directing appellant to appear before the investigator "to answer the questions put to him on April 18, 1961 and to answer such other and further questions as may be material to the subject matter of the investigation being conducted." Appellant has appealed from this order.

In this court, as below, the appellant's principal contention is based on the premise that under § 235(a) the district court was without authority to order him to appear and testify as a "witness" in an *ex parte* deportation investigation when he is the person at whom this proceeding is directed. He does not challenge the constitutionality of Congress' delegation of authority to the Service to issue administrative subpoenas of the type involved here. Rather, it is his position that in seeking to invoke the power to subpoena "witnesses" against an actual party in interest, the power thus sought to be exercised exceeds the statutory grant and it is in this that the mischief lies. In short, he argues that only an impermissive reading of the term witness in § 235(a) would permit its scope to embrace the party whose conduct has generated the subpoena.

Appellant bottoms his argument for a restrictive reading of the term witness in § 235(a) on the decision in United States v. Minker, 1956, 350 U.S. 179, 76 S.Ct. 281, 100 L.Ed. 185. We feel that appellant's reliance on Minker is wholly misplaced.

In Minker the Supreme Court considered the provisions of § 235(a) in the context of whether this section authorized an immigration officer to subpoena— as a witness—a naturalized citizen who was the subject of an investigation by the Service incident to a possible prospective denaturalization proceeding un-

der § 340(a) of the Act, 8 U.S.C.A. § 1450(a).

At the outset the Court conceded that the term "witness" as used in § 235(a) was patently ambiguous and that surely as a matter of pure "English usage" it might fairly be said to embrace any individual—including a party—who gives testimony in a proceeding. However, the Court went on to point out that a more precise assessment of the scope of this "Janus-faced word" could only be supplied by the circumstantial and statutory complex of its context from which it would derive its specific meaning and sustenance. Accordingly, after considering the entire Act the Court held that it could not say that Congress had provided with "sufficient clarity that the subpoena power granted by § 235(a) extends over persons who are the subject of denaturalization investigations." Id., 350 U.S. 190, 76 S.Ct. 288. And, in the absence of express language to this effect, the Court was unwilling to imply this authority where the rights of a citizen were involved.

However, nothing in Minker invalidated the basic Congressional grant of authority to the Immigration Service to issue administrative subpoenas in cases involving admitted aliens in deportation proceedings. Indeed, the clear thrust of the opinion unmistakably shows that there the restricted reading of the term witness was grounded narrowly on the conspicuous deference accorded the rights of citizens wherever ambiguity presents freedom of choice between competing alternatives. "In such a situation where there is doubt it must be resolved in the citizen's favor. Especially must we be sensitive to the citizen's rights where the proceeding is nonjudicial * * *." Id., 350 U.S. 188, 76 S.Ct. 287.

However, in assaying the correct interpretation to be attributed the term witness in the context of a deportation proceeding involving an admitted alien the foregoing considerations of policy which the Court felt gave "coherence to law and are fairly to be assumed as congressional presuppositions" are distinctly absent here. Moreover, the Supreme Court has frequently recognized the significant distinctions to be drawn between the amplitude of Congress' constitutional power to bar and exclude aliens and that more circumscribed area of activity where the Government seeks to deprive a citizen of his citizenship. Compare, United States v. Ju Toy, 1905, 198 U.S. 253, 25 S.Ct. 644, 49 L.Ed. 1040; Harisiades v. Shaughnessy, 1952, 342 U.S. 580, 72 S.Ct. 512, 96 L.Ed. 586; Shaughnessy v. United States ex rel. Mezei, 1953, 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956, with Ng Fung Ho v. White, 1922, 259 U.S. 276, 42 S.Ct. 492, 66 L.Ed. 938; Baumgartner v. United States, 1944, 322 U.S. 665, 64 S.Ct. 1240, 88 L.Ed. 1525; Gonzales v. Landon, 1955, 350 U.S. 920, 76 S.Ct. 210, 100 L.Ed. 806. Consequently, we agree with the district court that the Minker case cannot be read as in any wise restricting the power of a district director in a deportation proceeding as contrasted with a denaturalization hearing.

Finding no inhibiting language in Minker, it thus remains to determine whether we can say that Congress has provided with sufficient clarity that—as a "witness"—an alien is subject to administrative subpoena under § 235(a) in an investigatory proceeding concerning his privilege to remain in the United States. Adopting the approach of the Supreme Court that the term "witness" is itself a wholly neutral one whose content can best be derived from its environment and previous history, we find that there are a number of factors which impel us to answer this question in the affirmative.

At the outset it is clear that unlike the denaturalization proceeding involved in Minker where a judicial trial is necessary, exclusion and deportation proceedings involving aliens are primarily and essentially administrative in nature.

Accordingly, in two companion sections of the Act—not specifically dealing with subpoenas—Congress has expressly authorized immigration officers to require aliens to testify in administrative hearings as to their right to remain in this

country. Thus § 236(a), 8 U.S.C.A. § 1226(a), dealing with exclusion proceedings, provides that:

"A special inquiry officer shall conduct proceedings under this section, administer oaths, present and receive evidence, and interrogate, examine, and cross-examine the alien or witnesses."

Again in § 242(b), 8 U.S.C.A. § 1252(b) dealing with deportation proceedings, Congress has expressly provided that:

"A special inquiry officer shall conduct proceedings under this section to determine the deportability of any alien, and shall administer oaths, present and receive evidence, interrogate, examine and cross-examine the alien or witnesses."

Surely, in the light of these provisions, as the district court pointed out, it would be an exercise in futility for Congress to grant the Service authority to "interrogate, examine and cross-examine" an alien and yet withhold the subpoena power—a most meaningful device for accomplishing this end. To read § 235(a) as excluding the subpoena power against the alien who is the subject of an investigation would be to render sterile these other provisions of the Act.

Secondly, though the present § 235(a) was enacted in 1952 when Congress rewrote the whole body of the statutory immigration and nationality law, it had its genesis in Section 16 of the Immigration Act of 1917, 39 Stat. 874, 885 (former 8 U.S.C. § 152). This section—the immediate predecessor of § 235(a)—concerned the examination of entering aliens by the immigration service. The striking similarity of the two provisions is evident from a comparison of their pertinent words. The 1917 Act gave immigration officials "power to require by subpoena the attendance and testimony of witnesses * * * touching the right of any alien to enter, reenter, reside in or pass through the United States * * *." The 1952 Act provides "power to require by subpoena the attendance and testimony of witnesses * * * re-

lating to the privilege of any person to enter, reenter, reside in, or pass through the United States."

In two cases construing § 16 it was held that this section authorized the issuing of a subpoena upon an alien whose potential deportation was the subject of the investigation in connection with which the subpoena was issued. See Loufakis v. United States, 3 Cir., 1936, 81 F.2d 966; Graham v. United States, 9 Cir., 1938, 99 F.2d 746.

■ We believe that the fact that it has been twice held under predecessor legislation that the word "witness" fairly embraced potential deportees so as to render them subject to administrative subpoena by the Immigration Service is a weighty factor in any attempt to supply meaningful content to the ambiguities inherent in the word. It is a well settled rule of statutory interpretation that when a statute has been the subject of judicial construction and the statute is substantially reenacted, there is a strong indication of an intent to adopt the construction as well as the language of the former enactment. Becker v. General Chain Co., 1 Cir., 1921, 273 F. 419. Cf. Armstrong Paint & Varnish Works v. Nu-Enamel Corp., 1938, 305 U.S. 315, 59 S.Ct. 191, 83 L.Ed. 195.

■■ At the oral argument appellant urged that inasmuch as the term witness stands alone in § 235, it would be anomalous to accept the Government's position that the term possesses varying meanings so as to embrace an alien defendant in a deportation proceeding but not the citizen defendant in a denaturalization proceeding. However, it is not unusual for the same word to have differing connotations in the same act and surely no canon of statutory construction forecloses courts from attributing to the word the meaning which the legislature intended that it should have in each instance. As has been stated by the Supreme Court: "Where the subject-matter to which the words refer is not the same in the several places where they are used, or the conditions are different, or the scope of the

legislative power exercised in one case is broader than that exercised in another, the meaning well may vary to meet the purposes of the law, to be arrived at by a consideration of the language in which those purposes are expressed, and of the circumstances under which the language was employed." Atlantic Cleaners & Dyers v. United States, 1932, 286 U.S. 427, 433, 52 S.Ct. 607, 609, 76 L.Ed. 1204.

Surely the subject matter of an alien in a deportation case is significantly different from that of the citizen in a denaturalization case and just as surely the scope of the legislative power sought to be exercised in the former far transcends the latter.

Accordingly, we conclude that § 235(a) does empower an immigration officer to subpoena an admitted alien even though he may be the subject of an investigation by the Service looking towards his ultimate deportation.

Appellant's second contention involves a construction of the Order of the district court. As noted previously, this Order directed appellant "to answer the questions put to him on April 18, 1961 and to answer such other and further questions as may be material to the subject matter of the investigation being conducted." Appellant fears that a literal reading of the language of the court below would foreclose him from asserting any constitutional right, or legal justification which might be available to him at the subsequent hearing under pain of contempt. As thus construed, he argues that the Order would deprive him of his rights under the Fifth Amendment. The Government, on the other hand, urges that appellant has misconstrued the true meaning and effect of the Order. It contends that instead of foreclosing any rights which might be available to appellant, the Order simply requires him to attend the hearing and either answer the questions there proffered or articulate a specific and meaningful basis for declining to answer the questions. In the alternative, the Government contends that even if the Order is construed as precluding appellant from hereafter asserting any constitutional right or other legal justification, it is not violative of his constitutional rights because the present record fails to disclose any basis upon which appellant could have predicated a claim of the privilege against self-incrimination as a basis for refusing to answer questions put to him. The Government's argument on this latter point takes the position that the relevant statute of limitations had run on the only apparent offenses to which such questions might relate—offenses involving the fraudulent acquisition or use of passports.

While the language of the Order is somewhat ambiguous, reference to the court's accompanying opinion and to the allied papers in the case (National Foundry and Pipe Works v. Oconto Water Supply Co., 1902, 183 U.S. 216, 234, 22 S.Ct. 111, 46 L.Ed. 157, convinces us that the district judge did not intend to pass on whether the appellant might rely on claimed constitutional rights or legal justification for refusing to answer at the subsequent hearing but simply ordered that the appellant submit himself to the investigator for questioning.[1]

1. The opinion of the district court which accompanied the instant order includes the following paragraph:

"At the oral argument of this petition, counsel for respondent expressed some apprehension that an order of this Court might foreclose claimed constitutional rights of respondent. An examination of the transcript of the hearing held on April 18, 1961 indicated that respondent made no intelligent, intelligible, or otherwise identifiable claim of any particular constitutional right. Hence the fears expressed by counsel at the oral argument are premature on the record as it now stands." [194 F.Supp. 807.]

It is markedly apparent that had the district court intended that its Order "foreclose claimed constitutional rights" of appellant it would scarcely have styled his counsel's fears on this point as "premature."

Reinforcing our conclusion in this regard is the following statement by the district judge at the show cause hearing

Certainly, as a resident alien appellant was within the purview of the Fifth Amendment and entitled to invoke its safeguards. Kwong Hai Chew v. Colding, 1953, 344 U.S. 590, 73 S.Ct. 472, 97 L.Ed. 576. As such no judicial order could foreclose the appellant from asserting claimed constitutional rights, otherwise available. The Government has suggested in an alternative argument that by failing to crystallize the precise basis of his refusal to answer the questions at the initial hearing, appellant has waived his rights under the Fifth Amendment. We feel that it is unnecessary to determine whether appellant unequivocally waived his right to claim his privilege—a proposition not unfree from doubt—cf. Quinn v. United States, 1954, 349 U.S. 155, 75 S.Ct. 668, 99 L.Ed. 964. Emspak v. United States, 1955, 349 U.S. 190, 75 S.Ct. 687, 99 L.Ed. 997. However, at the initial hearing appellant was a voluntary witness at least in the sense that the administrative subpoena was not compulsory. Accordingly, as appellant was under no compulsion to testify in the initial investigation, it would scarcely seem that he should be required to claim the privilege against compulsory self-incrimination or be deemed to have waived it. Cf. Graham v. United States, supra. Such a result would hardly seem consonant with the well settled policy that "To preserve the protection of the Bill of Rights for hard-pressed defendants, we indulge every presumption against the waiver of fundamental rights." Glasser v. United States, 1942, 315 U.S. 60, at page 70, 62 S.Ct. 457, at page 465, 86 L.Ed. 680; Smith v. United States, 1949, 337 U.S. 137, 69 S.Ct. 1000, 93 L.Ed. 1264.

A judgment will be entered affirming the order of the district court.

referring to any order which he might issue:

"With regard to Paragraph 6 of the application, I assume you made reference to it. any order this Court might issue, if this Court issues an order, would direct him to appear before the Immigration Service and acknowledge or specifically claim the Constitutional or other privilege available to him."

From all of the foregoing, it is evident that the intent of the Order of the district court was not to foreclose appellant from asserting any constitutional privilege which might be available to him but simply to require that appellant either testify or specify with clarity and particularity, the basis upon which he registers any asserted constitutional privilege or legal justification.