**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| AMALGAMATED TRANSIT UNION LOCAL 1309, AFL-CIO; SELMA SHACKLEFORD; GREGORY PASSMORE; RONALD G. DUNCAN; TIMOTHY THURMANN; SAMUEL J. FRANK; ALEXANDER BRADLEY; MICHELE L. BOSWELL; JOHN A. TAYLOR; TERRENCE SANDIDGE; KUNIYUKI KASHIUAGI; GWENAIDA COLE; LELA SHIPMAN; SHARON K. HARRIS; FABIS HORTON III; PHILIP BINGHAM, *Plaintiffs-Appellants,* v. LAIDLAW TRANSIT SERVICES, INC.; FIRST TRANSIT, INC., *Defendants-Appellees.* | No. 05-56567 D.C. No. CV 05-1199 IEG SD Cal. ORDER AMENDING DISSENT FROM THE DENIAL OF REHEARING EN BANC AND ORDER AND AMENDED DISSENT |

Filed May 22, 2006
Amended May 31, 2006

Before: Alfred T. Goodwin, A. Wallace Tashima, and
Raymond C. Fisher, Circuit Judges.

Order;
Dissent by Judge Bybee

---

## ORDER

The dissent from the denial of rehearing en banc, filed on
May 22, 2006, is amended as follows:

5893

1.   In the dissent from the denial of rehearing en banc, slip opinion page 5584, lines 2-3: replace "the very same day that" with "ten days after".

2.   In the dissent from the denial of rehearing en banc, slip opinion page 5584, lines 9-12: replace "151 CONG. REC. H5598 (daily ed. June 30, 2005) (stating that the President notified the Clerk of the House that he signed the CAFA into law on February 28, 2005)" with "http://www.whitehouse.gov/news/releases/2005/02/20050218-12.html (stating that the President signed CAFA into law on February 18, 2005)".

## ORDER

A judge of the court called for a vote on whether to rehear the matter en banc. On such vote, a majority of the non-recused active judges failed to vote in favor of en banc rehearing.[1] But a small minority of active judges has dissented from the majority's denial of en banc rehearing.

As we stated in our initial Order (the "Order"), when we interpret a statute, "our purpose is always to discern the intent of Congress." *Amalgamated Transit Union Local 1309 v. Laidlaw Transit Serv., Inc.*, 435 F.3d 1140, 1146 (9th Cir. 2006) (citation omitted). And in pursuing that end, we recognized the Supreme Court's teaching that there is a "strong presumption that Congress has expressed its intent in the language it chose." *Id.* (citing *INS v. Cardoza-Fonseca*, 480 U.S. 421, 432 n.12 (1987). The dissent from the denial of rehearing en banc (the "dissent"), however, would turn that presumption into an irrebuttable one. It would do so by ignoring the substantial body of both Supreme Court and Circuit case law on which the Order's interpretation of 28 U.S.C.

---

[1]When an en banc call is rejected, as it was in this case, "the panel shall resume control of the case and no further en banc action is required." Ninth Cir. Gen. Order 5.5c.

§ 1453(c) is grounded. The dissent pretends that the entire office of statutory interpretation is comprehended within the plain meaning rule.[2] But the law, plainly, is not as the dissent would have it.

A quarter century ago, we recognized that the plain meaning rule:

> does not require a court to operate under an artificially induced sense of amnesia about the purpose of legislation, or to turn a blind eye towards significant evidence of Congressional intent in the legislative history. . . . [I]t is no talismanic invocation of an exclusively privileged status for apparently unambiguous statutory language. Rather, it is a recognition of the practical principle that evidence is sometimes so good in the first place to which one turns that it is unnecessary to look further.

*Heppner v. Alyeska Pipeline Serv. Co.*, 665 F.2d 868, 871 (9th Cir. 1981). This rule is consistent with the general principle of statutory construction recently restated by the Supreme Court:

> Th[e] canons [of statutory construction] are tools designed to help courts better determine what Congress intended, not to lead courts to interpret the law contrary to that intent. *Chickasaw Nation v. United States*, 534 U.S. 84, 94 (2001) (noting that "canons are not mandatory rules" but guides "designed to help judges determine the Legislature's intent," and that "other circumstances evidencing congressional intent can overcome their force").

---

[2]It admits of only three narrow "exceptions" to the plain meaning rule. Dissent at 5902-5903. It then spends the next five pages knocking down these straw men. *See id.* at 5902-5907.

*Scheidler v. Nat'l Org. of Women, Inc.*, 126 S. Ct. 1264, 1273-74 (2006).

Even in *Carson Harbor Village, Ltd. v. Unocal Corp.*, 270 F.3d 863 (9th Cir. 2001) (en banc), a case relied on by the dissent to support its position, *see* dissent at 5899, we plainly stated the controlling proposition here, which the dissent strives mightily to ignore: "We will resort to legislative history, even where the plain language is unambiguous, 'where the legislative history clearly indicates that Congress meant something other than what it said.' " *Id.* at 877 (quoting *Perlman v. Catapult Entm't, Inc. (In re Catapult Entm't, Inc.)*, 165 F.3d 747, 753 (9th Cir. 1999)).[3]

Finally, the dissent asserts that we "justified [our] decision by claiming that the statute was 'illogical'." Dissent at 5901. This is a misreading of our Order. We did not point out the illogic of the statute to justify our decision, but as further evidence in our search for Congress' intent. The dissent does not even acknowledge the primary purpose of statutory interpretation — to ascertain and to effectuate the intent of Congress — other than to scoff at it. Dissent at 5906 ("If Congress intended something different, let Congress fix it."). The dissent would woodenly apply the plain meaning rule to the exclusion of all other rules of statutory interpretation. But the dissent's unduly narrow view of the office of statutory interpretation comports with neither the teaching of the Supreme Court nor the law of our Circuit.

The *sua sponte* call for en banc rehearing is denied.

---

[3]The dissent does quote a sentence to the same effect from *Am. Tobacco Co. v. Patterson*, 456 U.S. 63, 75 (1982) ("Going behind the plain language of a statute in search of a possibly contrary congressional intent is a step to be taken cautiously even under the best of circumstances."), dissent at 5900, but ignores its teaching in its ensuing discussion.

BYBEE, Circuit Judge, with whom Judges KOZINSKI, O'SCANNLAIN, RYMER, CALLAHAN, and BEA join, dissenting from the denial of rehearing en banc:

Is less more? To lawyers, unlike philosophers, the question may appear facetious, but the answer has real-life implications. Section 5(a) of the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, § 5(a), 119 Stat. 4, 12-13, creates 28 U.S.C. § 1453(c)(1), which provides for a permissive appeal when the district court refuses to accept a class action removed from state court. *See Bush v. Cheaptickets, Inc.*, 425 F.3d 683, 685 (9th Cir. 2005). Specifically, section 1453(c)(1) provides:

> [A] court of appeals may accept an appeal from an order of a district court granting or denying a motion to remand a class action to the State court from which it was removed if application is made to the court of appeals *not less than* 7 days after entry of the order.

28 U.S.C. § 1453(c)(1) (emphasis added). Despite the clarity of this language, the panel announced that it would read the phrase "not *less* than 7 days" to mean "not *more* than 7 days." *Amalgamated Transit Union Local 1309 v. Laidlaw Transit Servs., Inc.*, 435 F.3d 1140, 1145-46 (9th Cir. 2006). As a result, the appellants' application, filed 43 days after the district court's order, was untimely.

The court now follows the misguided approach of the Tenth Circuit, which has announced that it too will read the phrase "not less than 7 days" as if it had been written "not more than 7 days." *See Pritchett v. Office Depot, Inc.*, 420 F.3d 1090, 1093 n.2 (10th Cir. 2005). I dissent from our refusal to rehear this case en banc because "I am convinced the parade is marching in the wrong direction." *United States v. Smith*, 440 F.2d 521, 527 (7th Cir. 1971) (Stevens, J., dissenting). The Republic will certainly survive this modest, but

dramatic, emendation of the *United States Code*; I am not so sanguine that in the long term it can stand this kind of abuse of our judicial power.

I

Plaintiffs-appellants, Amalgamated Transit Union Local 1309 and 15 individuals, filed suit against defendants-appellees Laidlaw Transit Services, Inc. and First Transit, Inc. in the San Diego County Superior Court. The appellants are current and former employees of the appellees and allege that the appellees violated California's meal and rest period laws. On June 9, 2005, appellees removed the action to the United States District Court for the Southern District of California, pursuant to 28 U.S.C. § 1446. Appellants moved to remand the action to state court. On October 5, 2005, the district court entered an order holding that it had subject matter jurisdiction over the suit as a class action under 28 U.S.C. §§ 1332(d)(1)(B) and (d)(2)(A) and denying the motion to remand.

The appellants filed a petition for permission to appeal to this court 43 days after the district court's order denying remand, a period that was, plainly, "not less than 7 days after entry of the [district court's] order." 28 U.S.C. § 1453(c)(1). Nevertheless, the panel found appellants' petition untimely. The panel declared section 1453(c)(1) "entirely illogical" because "[section 1453(c)(1)] as written creates a waiting period of seven days before which an appeal is *too early.*" *Amalgamated*, 435 F.3d at 1145. Though "troubled that, in contrast to most statutory construction cases where we are usually asked to construe the meaning of an ambiguous phrase or word, we are here faced with the task of striking a word passed on by both Houses of Congress and approved by the President, and replacing it with a word of the exact opposite meaning," the panel did just that. *Id.* at 1146. The panel's confession was forthright:

> We have construed the statute to require a procedural framework that is not readily apparent from the stat-

utory text or its legislative history, and have changed the statutory deadline for seeking to appeal to the opposite of what the plain language of the statute says. Under our interpretation, plaintiffs' timely notice of appeal is ineffectual and their subsequent petition for permission to appeal was filed too late.

*Id.*[1] Thus, the panel declared, a statute that reads "not *less* than 7 days" must henceforth be read to mean "not *more* than 7 days." *Id.*; *accord Pritchett*, 420 F.3d at 1093 n.2.

## II

The text of 28 U.S.C. § 1453(c)(1) is unmistakably clear, and the panel should have applied the statute as written. In its decision, the panel conceded that the language of section 1453(c)(1) is unambiguous. *Amalgamated*, 435 F.3d at 1145-46. Once it recognized that the statute is unambiguous, the panel should have stopped, for it is a paramount principle of statutory construction that " '[w]here [a statute's] language is plain and admits of no more than one meaning the duty of interpretation does not arise, and the rules which are to aid doubtful meanings need no discussion.' " *Carson Harbor Vill., Ltd. v. Unocal Corp.*, 270 F.3d 863, 878 (9th Cir. 2001) (en banc) (quoting *Caminetti v. United States*, 242 U.S. 470, 485 (1917)); *accord Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004) (noting that "the statute is awkward, and even ungrammatical; but that does not make it ambiguous").

---

[1]Although the panel declared the appellants' petition untimely under section 1453(c)(1), the panel nevertheless denied the defendants' motion to dismiss the petition in order "[t]o avoid the serious unfairness and potential due process violation that applying our holdings to this case might raise." After having determined that Federal Rule of Appellate Procedure 5 governs petitions filed under section 1453(c)(1), the panel "exercise[d] [its] authority under FRAP 2 to suspend for good cause the requirements of FRAP 5(a)(1), (b)(1) and (c) in this case, and construe[d] plaintiffs' timely notice of appeal and untimely petition for permission to appeal as together constituting one timely and proper petition for permission to appeal." *Amalgamated*, 435 F.3d at 1146-47.

Despite the fact that section 1453(c)(1) is clear and, therefore, the duty of interpretation did not arise, the panel nevertheless relied on legislative history to trump the statutory language. *See Amalgamated*, 435 F.3d at 1145-46. After finding that the statute itself was not good evidence of Congress's intent, the panel simply substituted the legislative history for the statute itself. But "[g]oing behind the plain language of a statute in search of a possibly contrary congressional intent is a step to be taken cautiously even under the best of circumstances." *Am. Tobacco Co. v. Patterson*, 456 U.S. 63, 75 (1982) (internal quotations omitted); *see also Lamie*, 540 U.S. at 539 (declaring resort to the legislative history of a facially clear statute "unnecessary").

This is troubling enough "under the best of circumstances," but even more disturbing is the fact that the report upon which the panel relied, Senate Report 109-14, was not submitted until eighteen days after the Senate had passed the bill, eleven days after the House had passed the bill, and ten days after that the President signed the bill into law. *See* S. Rep. No. 109-14, at 49 (2005), *reprinted in* 2005 U.S.C.C.A.N. 3, 46 (dated February 28, 2005); 151 Cong. Rec. H755 (daily ed. Feb. 17, 2005) (establishing that the House passed the CAFA on February 17, 2005); 151 Cong. Rec. S1249 (daily ed. Feb. 10, 2005) (establishing that the Senate passed the CAFA on February 10, 2005); http://www.whitehouse.gov/news/releases/2005/02/20050218-12.html (stating that the President signed CAFA into law on February 18, 2005). Accordingly, the panel read a statute to mean the exact opposite of what it says based on a Senate report that no senator—much less members of the House or the President—ever saw.[2]

---

[2]*See Heppner v. Alyeska Pipeline Serv. Co.*, 665 F.2d 868, 871 n.1 (9th Cir. 1981) ("There is even the possibility that some legislative history is manufactured for the purpose of misleading the courts as to what most members of Congress intended to enact."); *United States v. Anderson*, 895 F.2d 641, 647 (9th Cir. 1990) (Kozinski, J., dissenting) ("[Legislative] history is rarely written by the same people who wrote the legislation; it is

The panel justified its decision by claiming that the statute was "illogical." *Amalgamated*, 435 F.3d at 1146. However, the courts' role is to give effect to statutes as Congress enacts them; it is not the courts' role to assess whether a statute is wise or logical. *See United States v. Locke*, 471 U.S. 84, 93-96 (1985). Had I been a member of Congress, or an attorney reviewing the statute prior to recommending that the President sign the CAFA, I might have agreed with the panel's observation that the statute is "illogical." We might also think it was "dumb" and "stupid." Those labels have no legal meaning here. We are a court—charged with interpretation, not legislation—and I know of no "illogicality" doctrine that permits us to change the words in a statute when we think there is a more logical way that Congress could have written it. There are, of course, doctrines by which we may deal with various interpretive dilemmas but, as I discuss in the next section, none of our existing exceptions to the plain meaning rule justifies the panel's decision.

## III

No recognized exception to the plain language rule allows the panel to redraft 28 U.S.C. § 1453(c)(1) to its liking. There are three doctrines, of which I am aware, that might justify a creative interpretation of problematic literal language: the doctrine of constitutional avoidance, the scrivener's error exception, and the absurdity doctrine.

---

seldom, if ever, even seen by most of the legislators at the time they cast their votes.") (citing *Hirschey v. FERC*, 777 F.2d 1, 7-8 & n.1 (D.C. Cir. 1985) (Scalia, J., concurring)); *see also* Dan Eggen, *Record Shows Senators' "Debate" That Wasn't*, WASH. POST, Mar. 29, 2006, at A6 (discussing 15 pages of "debate" between two senators over the Detainee Treatment Act that never actually occurred, but was inserted into the Congressional Record minutes before the Senate approved the legislation, and was subsequently cited to the Supreme Court in the *Hamdan* case).

## A

The constitutional avoidance doctrine fails to justify the panel's interpretation of section 1453(c)(1). This doctrine allows a court to deviate from the language of a statute when giving effect to the statute's apparent meaning would likely render the statute unconstitutional. *See Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 465-66 (1989) (construing the Federal Advisory Committee Act narrowly to avoid "formidable constitutional difficulties"); *Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 510-11 (1989) (deviating from the plain language of Federal Rule of Evidence 609 because a plain reading of the rule would violate the Due Process Clause). In the instant case, however, no constitutional infirmity stems from giving effect to the plain language of section 1453(c)(1) and, thus, the constitutional avoidance doctrine cannot justify the panel's decision. Indeed, the principle of constitutional avoidance cuts in the entirely opposite direction, as the panel implicitly recognizes when it refuses to apply its own holding to the case at hand. *See* n.1 *supra*.

## B

Congress's use of the term "less," as opposed to a word that means the exact opposite, is not a scrivener's error that this court may casually correct. The scrivener's error exception to the plain meaning rule allows a court to "correct" Congress's mistakes only when a statute contains obvious clerical or typographical errors. *See, e.g.*, *U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 462 (1993) (correcting a scrivener's error of misplaced punctuation marks); *United States v. Coatoam*, 245 F.3d 553, 557 (6th Cir. 2001) (correcting a scrivener's error that cross-referenced the wrong subsection of an act); *United States v. Scheer*, 729 F.2d 164, 169 (2d Cir. 1984) (correcting a scrivener's error that required a certificate to be furnished "upon *request* of the . . . request," instead of "upon *receipt* of the . . . request"); *King v. Hous. Auth.*, 670 F.2d 952, 954 n.4 (11th Cir. 1982) (correcting a

scrivener's error that cross-referenced the wrong subsection of the statute).

We cannot declare Congress's choice of the statutory language in 28 U.S.C. § 1453(c)(1) a clerical error simply because we disagree with the logic of the terms that Congress used. Although the Tenth Circuit has declared section 1453(c)(1)'s use of the term "less" a "typographical error," *Pritchett*, 420 F.3d at 1093 n.2, it is not at all clear that this is the case. Section 1453(c)(1) makes perfect sense; it is fully grammatical and can be understood by people of ordinary intelligence. That we think Congress might choose a different word if it decides to redraft the statute hardly means that someone made a "typographical error" that the court may blithely correct. " 'It is beyond [the Court's] province to rescue Congress from its drafting errors, and to provide for what we might think . . . is the preferred result.' " *Lamie*, 540 U.S. at 542 (ellipsis in original) (quoting *United States v. Granderson*, 511 U.S. 39, 68 (1994) (Kennedy, J., concurring)).

C

Finally, section 1453(c)(1), as written, does not produce any absurdity in the Act. Under the absurdity doctrine, courts may refuse to give effect to Congress's chosen words when applying the plain language of the statute would lead to patently absurd results. *See United States v. Brown*, 333 U.S. 18, 27 (1948). For example, if a reading of a statute would render another section within the statute or within the act inoperative or contradictory, then the court will try to read the statute as a whole to make sense. *See, e.g.*, *Yates v. Hendon*, 541 U.S. 1, 17-18 (2004) (avoiding "absurd results" by refusing to adopt a reading of ERISA that would result in "intolerable conflict" between separate titles of the Act) (citation omitted); *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 461-62 (2002) (declining to invoke an exception to the plain language rule because the plain language of the statute did not contain "conflicting provisions"); *Brown*, 333 U.S. at 25-27 (refusing

to give effect to the plain language of the statute when doing so would render the statute unenforceable as to many potential offenders).

Quite plainly, the absurdity doctrine does not apply here. Nothing in section 1453(c)(1) renders any part of the Act contradictory or unenforceable. Although the apparent seven-day waiting period and no-outside-limit-on-when-the-appeal-can-be-filed provision may *seem* inconsistent with the tight deadlines in the CAFA, the provision does not actually contradict any other provision in the Act. Furthermore, the section is capable of enforcement and does not render any provision of the CAFA superfluous.

Congressionally-imposed deadlines are "inherently arbitrary" and are not absurd, even when they may seem irrational. *Locke*, 471 U.S. at 94 (quoting *United States v. Boyle*, 469 U.S. 241, 249 (1984)). The arbitrary deadline at issue in *Locke* required mining claimants to file certain applications "*prior to* December 31 of each year." *Id.* at 87 n.2 (emphasis added). Although the Court recognized that the wording of the statue understandably led claimants to believe they could file the requisite applications *on* December 31, the Court refused to second guess the wisdom of the filing deadline that Congress had imposed. *Id.* at 95. The Court declared that, while use of the "phrase 'prior to' may be clumsy, . . . its meaning is clear." *Id.* at 96. Accordingly, the Court enforced the statute as written, so that anything filed after December 30 was late. *Id.* at 95. Despite confusion that may arise from a filing deadline, Congress's failure to act with foresight regarding the consequences of the terms it imposes does not justify a court's redrafting of the statute. *Id.*

The panel cannot declare with any certainty that Congress would never have intended to impose a waiting period before which filing a petition for permission to appeal is too early. Although Congress frequently uses the phrase "not more than

__ days,"[3] it has also used the phrase "not less than ___ days" in other statutes to create mandatory waiting periods that may seem "illogical." *See, e.g.*, 22 U.S.C. § 276c-4 (2000) (requiring the Secretary of State to report to Congress "not less than 180 days after October 28, 1991," but giving no deadline before which the Secretary must report); 42 U.S.C. § 610(b)(2) (2000) (requiring the Department of Health and Human Services to wait "not less than 60 days" before issuing a determination of an appeal but creating no upper limit before which the Department must render a decision); 42 U.S.C. § 12705(c)(3) (2000) (requiring the Secretary of Housing and Urban Development to wait "not less than 30 days" after receiving a submission to render a decision, but creating no deadline before which the Secretary must render his or her decision); 49 U.S.C. § 47509(d) (2000) (requiring the Administrator of the Federal Aviation Administration to report to Congress "not less than 280 days after August 23, 1994," but giving no deadline before which the Administrator must report to Congress). In light of Congress's practice of creating mandatory waiting periods without imposing deadlines before which filings must be made, we cannot say that Congress's decision to do so in section 1453(c)(1) leads to results so absurd that Congress could not possibly have intended them.

IV

There are real consequences to a court's well-intentioned decision to fix Congress's mistakes. First, if courts are going to correct whatever they perceive to be Congress's mistakes, Congress should lose all confidence that courts will enforce

---

[3]*See, e.g.*, 15 U.S.C. § 6758(e)(2)(B) (declaring that disciplinary action against an insurance agent or broker is subject to review by NAIC if filed "not more than 30 days after" notice of action is filed or received); 20 U.S.C. § 7705(d)(2) (stating that the Secretary of Education shall approve an application filed "not more than 60 days" after deadline, less ten percent reduction in payment); 28 U.S.C. § 2243 (requiring the court to set a date for hearing on a petition for habeas corpus "not more than five days" after the writ or order is returned).

statutes as written. The panel has construed Congress's admittedly clear language to mean the precise opposite of what it says. In so doing, the panel has ignored the deference we must give to the supremacy of the legislature. *See Lamie*, 540 U.S. at 538; *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 548 (1987); *Locke*, 471 U.S. at 95-96. Section 1453(c)(1) is a validly enacted statute: Congress complied with Article I, Section 7, and the President signed the bill. Congress should be able to rely on the courts to give effect to the statute as enacted, even if Congress thought it would be convenient for us to correct its apparent mistakes.[4]

Furthermore, "rescuing" Congress from what the panel assumes was a mistake forces both the legislative and judicial branches to deviate from their respective constitutional roles. *See Lamie*, 540 U.S. at 542. When courts turn the meaning of statutes up-side-down, Congress must legislate defensively, not by enacting statutes in the plainest possible language, but by enacting statutes in the language that it *predicts* the courts will interpret to effectuate its intentions. How can we know Congress's intentions except by looking to its public acts? What if the legislative history is inaccurate? What if some member of Congress made the change deliberately at the last moment? What if, as is the case here, the legislative history did not exist until well after the legislature passed the bill? What other language could Congress have used to effect that no interlocutory appeal could be filed under CAFA until seven days after entry of an order? If Congress intended to do something different, let Congress fix it.

---

[4]If Congress had added a provision to the CAFA that said, "If any provision of this Act appears illogical, the courts may correct it," the provision would surely violate (and thus revive) the nondelegation doctrine. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457 (2001); *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935); *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935). Even if Congress invited us to correct its "illogical" acts, we would have to decline the invitation because we cannot amend acts by our judgments.

Second, the panel's decision strips citizens of the ability to rely on the laws as written. This case is a prime example: The appellants relied on section 1453(c)(1) and filed in this court a timely petition for permission to appeal. Yet, despite the appellants' well-founded reliance on the statute, the panel declared the petition untimely. Such a ruling, in light of an unquestionably clear statute, prevents even the most prudent citizen from ever being confident that his conduct comports with the legislature's laws as the court might choose to enforce them. The panel's decision is a trap for citizens (and their lawyers) who can no longer trust the statute as written to mean what it plainly says, but must look to our decisions in every instance for a contrary construction. The *United States Code* has traps enough without creating new grounds for malpractice claims.

Third, and perhaps most importantly, the panel's decision undermines our own credibility. If we insist on reading "not less than 7 days" to mean "not more than 7 days," why should anyone reading our opinions trust that he understands them correctly? If words are so malleable, might we routinely read our own precedents as saying the opposite of what they clearly say? May one panel simply rewrite another panel's opinion when it thinks the prior opinion is "illogical?" And where might our creativity lead us with provisions of the Constitution that don't make as much sense as we would like?[5] May we amend even the Constitution at will? If we think that when Congress says "less" it actually means "more," we should not fault anyone who might, as a result, discount other things that we have written.

---

[5]*See, e.g.*, Michael Stokes Paulsen, *Someone Should Have Told Spiro Agnew*, 14 CONST. COMMENT. 245, 245 (1997) (pointing out that Vice President Agnew, as president of the Senate, would have presided at his own impeachment trial); *see also* CONSTITUTIONAL STUPIDITIES, CONSTITUTIONAL TRAGEDIES (William N. Eskridge, Jr. & Sanford Levinson eds., 1998).

* * * * *

We command no army; we hold no purse. The only thing we have to enforce our judgments is the power of our words. When those words lose their ordinary meaning—when they become so elastic that they may mean the opposite of what they appear to mean—we cede our right to be taken seriously. Neither Congress, nor the parties, nor the judiciary benefits from the panel's decision.

I respectfully dissent from the Court's failure to rehear this case en banc and to correct our well-intentioned, but obvious, error.

PRINTED FOR
ADMINISTRATIVE OFFICE—U.S. COURTS
BY THOMSON/WEST—SAN FRANCISCO

The summary, which does not constitute a part of the opinion of the court, is copyrighted
© 2006 Thomson/West.