# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PAULO E. GALLARDE,
                    *Plaintiff-Appellant,*

v.

IMMIGRATION AND NATURALIZATION
SERVICE,
                    *Defendant-Appellee.*

No. 04-56353

D.C. No.
CV-01-01011-LAB

OPINION

Appeal from the United States District Court
for the Southern District of California
Larry A. Burns, District Judge, Presiding

Argued and Submitted
October 26, 2006—Pasadena, California

Filed May 11, 2007

Before: Myron H. Bright,* A. Wallace Tashima, and
Carlos T. Bea, Circuit Judges.

Opinion by Judge Bea

---

*The Honorable Myron H. Bright, Senior United States Circuit Judge for the Eighth Circuit, sitting by designation.

**COUNSEL**

Howard Hom, Esq., and Gail A. Dulay, Esq., San Diego, California, for plaintiff-appellant Paulo E. Gallarde.

Samuel W. Bettwy, Assistant United States Attorney, San Diego, California, for the defendant-appellee the United States Department of Homeland Security.

**OPINION**

BEA, Circuit Judge:

For nearly ninety years it has been clearly established that aliens who seek exemption from compulsory military service —the draft—based on alienage will be forever barred from becoming United States citizens. Here, we are asked to decide whether this bar to citizenship applies to an alien who voluntarily enlisted in the United States Navy, sought discharge short of completing his enlistment term on the basis of alienage, and was honorably discharged. We hold that the bar does not apply.

**Facts**

On February 27, 1991, while ground combat operations during Operation Desert Storm were underway in Kuwait and Iraq, Paulo E. Gallarde ("Gallarde"), a 32 year-old Philippine national, immigrated to the United States as a lawful perma-

nent resident alien. Eight months later, Gallarde voluntarily enlisted in the United States Navy, thereby incurring a four-year active duty service obligation. After serving seven months in the United States Navy Reserve, Gallarde entered active duty on May 5, 1992.

In March 1993, Gallarde injured his back while on duty. As a result of that injury, Gallarde claims to have endured pain on a daily basis and to have begun experiencing numbness in his left leg. When Gallarde spoke with a corpsman about the possibility of being medically discharged, he was advised that such a request would be denied. Gallarde, however, was advised that he could seek a discharge on the ground that he was an alien.

On March 17, 1995, Gallarde requested an early separation from the United States Navy. Although Gallarde did not specify a basis for his request, Gallarde's command treated his request as a request for early separation on the basis of alienage. On March 19, 1995, Gallarde's commanding officer exercised the discretion given him by applicable regulations and denied Gallarde's request because the Navy was experiencing a shortage of sailors in Gallarde's occupational specialty.

On May 28, 1995, Gallarde again requested early separation, indicating that he was requesting "to be separated fromm [sic] the United States Navy on the basis of being an alien . . . ." On June 7, 1995, Gallarde was informed[1] by his command "that any alien [who] applies for discharge from service in the Armed Forces of the United States on the grounds that the member is an alien, and is discharged from such service on such grounds, shall be permanently ineligible to become a citizen of the United States, except if member is exercising treaty rights and served in the armed forces of the country in which the member is a citizen . . . ." On October 27, 1995,

---

[1]Incorrectly, as it turns out.

approximately six months short of completing his voluntary military service obligation, Gallarde was honorably discharged from the United States Navy on the basis of alienage.

In January 1997, Gallarde filed an Application for Naturalization, which the then Immigration and Naturalization Service ("INS") denied. The INS ruled he was barred from becoming a citizen under Section 315 of the Immigration and Nationality Act of 1952 ("§ 315"). *See* The Immigration and Nationality Act, Pub. L. No. 414, § 315, 66 Stat. 162, 242 (1952) (codified at 8 U.S.C. § 1426).

Gallarde then filed this action to review the denial of his Application for Naturalization. Gallarde argued that § 315 does not bar him from becoming a citizen because he was not "liable for service" within the meaning of § 315. Specifically, Gallarde argued § 315 bars only aliens who request and receive exemption, relief, or discharge from liability for the draft, not those who request early release from voluntary military service from becoming a citizen.

The district court denied Gallarde's petition, holding that § 315 barred him from becoming a citizen. The district court reached this conclusion without first determining whether "training or service in the Armed Forces," as used in § 315, and "military training or military service," as used in 8 C.F.R. § 315.1, include voluntary military training or service. Rather, relying on the definition of "liability" in the 2004 edition of Black's Law Dictionary, the district court determined that "liability," as used in 8 C.F.R. § 315.2(b)(1), includes contractual liability. Thus, the district court held that § 315 barred Gallarde from becoming a United States citizen because Gallarde was separated on the basis of alienage from voluntary military service for which he had contracted pursuant to an enlistment contract.

## Standard of Review

We review *de novo* a district court's interpretation and construction of a federal statute. *See United States v. Hernandez-Vermudez*, 356 F.3d 1011, 1013 (9th Cir. 2004).

## Discussion

Gallarde raises the same argument on appeal that he raised below, *i.e.*, that § 315's citizenship bar applies only to aliens exempted or discharged from liability for the draft.

**[1]** We are mindful that "[t]he deprivation of the privilege of acquiring citizenship, which an alien in permanent residence normally enjoys, is a substantial penalty." *In re Rego*, 289 F.2d 174, 176 (3rd Cir. 1966); *see also United States v. Lacher*, 299 F.2d 919 (9th Cir. 1962) (expressly relying on *In re Rego*). The loss of that opportunity, no less than the loss of citizenship itself, "may result in 'loss of both property and life, or of all that makes life worth living.' " *United States v. Minker*, 350 U.S. 179, 187 (1956) (quoting *Ng Fung Ho v. White*, 259 U.S. 276, 284 (1922)). Thus, "[a] statute which attaches such a penalty to certain conduct should be construed strictly to avoid an imposition which goes beyond the manifest intent of Congress." *In re Rego*, 289 F.2d at 176 (citing *Minker*, 350 U.S. 179).

**[2]** Section 315 is such a statute:

(a) Permanent ineligibility

Notwithstanding the provisions of section 405(b) but subject to subsection (c) of this section, any alien who applies or has applied for exemption or discharge from *training or service in the Armed Forces* or in the National Security Training Corps of the United States on the ground that he is an alien, and is or was relieved or discharged from such training

or service on such ground, shall be permanently ineligible to become a citizen of the United States.

(b)   Conclusiveness of records

The records of the Selective Service System or of the Department of Defense shall be conclusive as to whether an alien was relieved or discharged from *such liability for training or service* because he was an alien.

(c)   Service in armed forces of foreign country

An alien shall not be ineligible for citizenship under this section or otherwise because of an exemption from training or service in the Armed Forces of the United States pursuant to the exercise of rights under a treaty, if before the time of the exercise of such rights the alien served in the Armed Forces of a foreign country of which the alien was a national.

8 U.S.C. § 1426 (emphasis added).

The Immigration and Nationality Act of 1952 does not define "training or service in the Armed Forces" or "such liability for training and service" and, therefore, does not, by its explicit terms, either establish or foreclose the interpretation advanced by Gallarde.

The Immigration Act of 1990 vested "sole authority to naturalize persons as citizens of the United States" in the United States Attorney General; courts retained authority to administer the oath of citizenship. *Compare* 8 U.S.C. § 1421(a) (1970), *with* 8 U.S.C. § 1421(a) (1990). Thus, "the power to naturalize plainly was shifted by the 1990 [Act] from the courts to the [Immigration and Naturalization Service ("INS")]." *Gorbach v. Reno,* 219 F.3d 1087, 1089 (9th Cir. 2000). The INS, exercising its newly acquired authority, pro-

mulgated 8 C.F.R. § 315.2. Therein, it adopted existing court recognized exceptions to § 315's bar to citizenship, including:

> (1) At the time that he or she requested an exemption from military service, the applicant had no liability for such service even in the absence of an exemption;

> \* \* \*

> (7) The applicant is applying for naturalization pursuant to section 329 of the Act.

8 C.F.R. § 315.2(b)(1),(7);[2] *see also* 56 Fed. Reg. 50477 ("Part 315, Persons Ineligible To Citizenship: Exemption

---

[2]When § 315 was enacted in 1952, exclusive jurisdiction to naturalize persons as United States citizens was vested in various federal and state courts. *See Tutun v. United States*, 270 U.S. 568, 575-76 (1926). Although the text of the Immigration and Nationality Act of 1952 contains no exceptions to § 315's citizenship bar, federal courts recognized several exceptions. *See, e.g.*, *Astrup v. INS*, 402 U.S. 509 (1971) (excepting alien from citizenship bar who was inducted into the Armed Forces notwithstanding earlier alienage exemption); *Bachmann v. United States*, 327 F.2d 415, 416 (9th Cir. 1964) (discussing knowing and intelligent waiver prerequisite to § 315's citizenship bar) (*citing Moser v. United States*, 341 U.S. 41 (1951) (requiring same as to § 315's predecessor)); *In re Wendt*, 300 F.Supp. 725, 727 (N.D. Ill. 1969) (excepting alien from citizenship bar who was not liable for the draft when application for exemption was made); *In re Madsen*, 267 F.Supp. 888, 889 (C.D. Cal. 1967) (excepting alien from citizenship bar who did not knowingly and intelligently waive citizenship); *Petition of Felleson,* 169 F.Supp. 471, 473-74 (N. D. Ill. 1958) (excepting alien eligible for naturalization under Public Law 86, 83rd Cong. 1st Sess.—the predecessor to § 329 of the Immigration and Nationality Act of 1952—on the basis of wartime military service notwithstanding that alien was barred under § 315); *In re Planas*, 152 F.Supp. 456 (D. N.J. 1957) (excepting alien given inaccurate advice as to consequences of exemption by his draft board). None of these cases, however, addresses the question at bar, *i.e.*, whether § 315's citizenship bar extends to aliens exempted or discharged from *voluntary* training or service in the Armed Forces.

From Military Service, is a new part *derived entirely* from existing interpretations [of § 315].” (emphasis added)).[3] “Exemption from military service[, in the first exception,] means either: (1) A permanent exemption from induction . . . ; or (2) The release or discharge from *military training or military service* . . . .” 8 C.F.R. § 315.1. Like the Immigration and Nationality Act of 1952, 8 C.F.R., Part 315 does not define “such service,” as used in 8 C.F.R. § 315.2(b)(1), or “military training or military service,” as used in 8 C.F.R. § 315.1. Accordingly, neither 8 C.F.R. § 315.1 nor § 315.2 resolves the question we face, *i.e.*, whether “training or service in the Armed Forces,” as used in § 315(a), and “military training or military service,” as used in 8 C.F.R. § 315.1, include voluntary training or service in the Armed Forces or, as Gallarde contends, include only compulsory training or service in the Armed Forces.

## I.  Determining The Meaning Of “Training Or Service In The Armed Forces”

“Because this case involves an administrative agency’s construction of a statute that it administers, our analysis is governed by *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).” *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000). The

---

[3]Given that women have never been liable for the draft, the INS’s use of “he or she” and “his or her” in 8 C.F.R. § 315.2 arguably suggests the INS interpreted § 315’s citizenship bar as applying to aliens discharged from voluntary military service from becoming citizens. The existing interpretations from which 8 C.F.R. § 315.2 was entirely derived, however, exclusively involve cases in which male aliens were exempted or discharged from liability for the draft. In addition, that the INS intended “he or she” and “his or her” to indicate § 315 applies to exemptions from voluntary military service is arguably belied by the use of “treaty national” and “he or she” in 8 C.F.R. § 315.2(b)(6)(I), because the referenced treaties, *see* 8 C.F.R. § 315.4, address the exemption of treaty nationals from liability for compulsory military service in the United States military, a singularly male liability.

Supreme Court has articulated *Chevron* analysis as requiring a contextual analysis of the statute at issue:

> In determining whether Congress has specifically addressed the question at issue, a reviewing court should not confine itself to examining a particular statutory provision in isolation. The meaning—or ambiguity—of certain words or phrases may only become evident when placed in context. It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.

*Id.* at 132-33 (internal citations and quotation marks omitted); *see also Gorbach*, 218 F.3d at 1093 (holding that a statute "must be read in context with a view to its place in the statutory scheme, not in isolation").

In addition to reading a statute with a view to its place in the overall statutory scheme, a statute must also be read in historical context. *See Se. Cmty. Coll. v. Davis*, 442 U.S. 397, 411 (1979) ("Although an agency's interpretation of the statute under which it operates is entitled to some deference, 'this deference is constrained by our obligation to honor the clear meaning of a statute, as revealed by its language, purpose, and *history*." (emphasis added) (quoting *Teamsters v. Daniel*, 439 U.S. 551, 566 n. 20 (1979))). Standing alone the phrase "training or service in the Armed Forces" in § 315(a) is broad enough to include voluntary training or service in the Armed Forces. Our task, however, is not to determine the meaning of the phrase "training or service in the Armed Forces" in isolation. Rather, we must determine the meaning of "training and service in the Armed Forces" in context because "[t]he meaning—or ambiguity—of certain words or phrases may only become evident when placed in context." *Brown & Williamson Tobacco*, 529 U.S. at 132-33.

At the outset we note the phrase "training or service in the Armed Forces," in § 315(a) is not modified by "all," "compulsory," or "voluntary." Thus, "training or service in the Armed Forces" in § 315(a) can fairly be interpreted to include (1) all training and service in the Armed Forces; (2) only compulsory training and service in the Armed Forces; or (3) only voluntary training and service in the Armed Forces. *See*, *e.g.*, *Robinson v. Shell Oil Co.*, 519 U.S. 337 (1997) (finding the term "employee" in an anti-retaliation section of Title VII could be read to include only former employees, only current employees, or both); *Minker*, 350 U.S. at 186 ("In short, ["witnesses"] is patently ambiguous: it can fairly be applied to anyone who gives testimony in a proceeding, although the proceeding immediately or potentially involves him as a party, or it may be restricted to the person who gives testimony in another's case").

Ambiguity for *Chevron* purposes, however, "is a creature not of definitional possibilities but of statutory context." *See Brown v. Gardner*, 513 U.S. 115, 118 (1994). Here, as we will see, when § 315 is read in statutory and historical context, "training or service in the Armed Forces" unambiguously includes only *compulsory* training or service in the Armed Forces. Thus, § 315's citizenship bar does not apply to aliens, like Gallarde, discharged on the basis of alienage from voluntary training and service in the Armed Forces.

## II. Statutory Context Of § 315

[3] Congress, through §§ 315, 328, and 329 of the Immigration and Naturalization Act of 1952, continued a set of laws that provides immigration benefits and penalties tied to military service and the avoidance thereof on the basis of alienage. *See infra*, III.C (discussing historical structure). Under § 329, a single day of honorable military service during a designated period of hostilities qualifies an alien for accelerated naturalization.[4] *See* The Immigration and Nationality

---

[4] Absent acceleration, a legal permanent resident must accrue five years of continuous residence prior to his or her application for citizenship, the

Act, Pub. L. No. 414, § 329, 66 Stat. 162, 250 (1952) (codified at 8 U.S.C. § 1440). However, under § 329 "no person who is or has been *separated* from such service on account of alienage . . . shall be regarded as having served honorably or having been separated under honorable conditions *for the purposes of this section*." *Id.* (emphasis added). Thus, Congress imposed a limited penalty short of a citizenship bar on aliens separated from military service on the basis of alienage, *i.e.*, ineligibility for accelerated naturalization under § 329.

[4] An alien separated from military service on the basis of alienage, however, may still qualify for accelerated naturalization under § 328. Thereunder, an alien qualifies for accelerated naturalization by serving honorably for a period or periods aggregating one year. *See* Immigration and Nationality Act § 328 (codified at 8 U.S.C. § 1439).[5] Significantly, aliens discharged on the basis of alienage are not excluded from accelerated naturalization under § 328. *Cf. Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 452 (2002) ("[W]hen

last three months of which must be in the state or district in which the citizenship application is filed. *See* 8 U.S.C. § 1427.

[5]When enacted, during Gallarde's Navy service, and when he was honorably discharged, § 328 stated:

A person who has served honorably at any time in the armed forces of the United States for a period or periods *aggregating three years*, and who, if separated from such service, was never separated except under honorable conditions may be naturalized without having resided continuously immediately preceding the date of filing of such person's petition, in the United States for at least five years, and in the State in which the petition for naturalization is filed for at least six months, and without having been physically present in the United States for any specified period . . . .

66 Stat. at 249 (emphasis added) (codified at 8 U.S.C. § 1439). Section 328 was subsequently amended to reduce the required period of military service to one year. *See* National Defense Authorization Act for Fiscal Year 2004, Pub. L. No. 108-136, § 1701(a), 117 Stat. 1392, 1691 (2003).

Congress includes particular language in one section of a stat-ute but omits it in another section of the same Act, it is gener-ally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (internal quotation marks omitted)). Thus, a period of otherwise honorable mili-tary service not considered honorable for purposes of acceler-ated naturalization under § 329, may be regarded as honorable for the purposes of accelerated naturalization under § 328.[6]

Here, were we to hold, as the Government proposes, that "training or service in the Armed Forces," as used in § 315, includes voluntary military service, we would render § 329's limited penalty superfluous and the absence of such a penalty in § 328 insignificant; if § 315(a)'s citizenship bar applies to separation on the basis of alienage from voluntary military service, it would be irrelevant whether that service qualified an alien for § 329's relaxed naturalization requirements. This we cannot do because "[i]t is our duty to give effect, if possi-ble, to every clause and word of a statute[,]" *United States v. Menasche*, 348 U.S. 528, 538-39 (1955) (internal quotation marks omitted), and "[i]t is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *TRW Inc.*

---

[6]Gallarde's three and a half years of honorable military service qualified him for accelerated naturalization under § 328 in 1995. Aliens eligible for naturalization under § 329 are expressly excepted from § 315's citizenship bar by 8 C.F.R. § 315.2(b)(7), which was derived from *Petition of Felle-son*, 169 F.Supp. at 473-74 (excepting from citizenship bar an alien eligi-ble for naturalization under § 329's predecessor, Public Law 86, 83rd Cong. 1st Sess., because that legislation did not expressly withhold accel-erated naturalization from aliens barred by § 315). Because we hold that § 315's citizenship bar does not apply to aliens, such as Gallarde, dis-charged from voluntary military service on the basis of alienage, we do not decide whether aliens eligible for accelerated naturalization under § 328 are likewise excepted from § 315's citizenship bar.

*v. Andrews*, 534 U.S. 19, 31 (2001) (internal quotation marks and citations omitted).[7]

[5] Congress's use in § 329 of the phrase "enlistment or induction" is also instructive because it demonstrates that where Congress intended to impose a disability upon aliens discharged from *voluntary* training or serving in the Armed Forces on the basis of alienage it did so expressly by including both "enlistment," a term denoting voluntary military service, *see infra* section III, and "induction," a term denoting involuntary military service, *id*. *See* 8 U.S.C. § 1440. Accordingly, reading § 315 in statutory context, we conclude § 315's citizenship bar applies only to aliens exempted or discharged from compulsory training or service in the Armed Forces.

---

[7]In addition, were we to read § 315's citizenship bar as applying to aliens exempted or discharged on the basis of alienage from voluntary training and service, we would reach at least one absurd result. Section 314 prevents circumvention of § 315 by denying citizenship to aliens who leave the United States to avoid the draft rather than apply for an alienage exemption that would trigger § 315's citizenship bar. *See* Immigration and Nationality Act § 314 (codified at 8 U.S.C. § 1425). Section 314 also bars from citizenship aliens who desert the Armed Forces during time of war. *Id.* Section 314, however, does not bar from citizenship aliens who desert during time of peace. *Id.* Thus, were we to read § 315's citizenship bar as applying to aliens eligible for naturalization under § 328, an alien who deserts the Armed Forces during peacetime (a crime punishable by up to five years of confinement, *see* 10 U.S.C. § 885) would remain eligible to become a United States citizen, but an alien who requests and is granted a discretionary discharge, *see* section IV *infra*, would be barred from becoming a citizen. Thus, under the interpretation proposed by the Government, had Gallarde merely "gone over the hill" rather than follow regulations Gallarde would be eligible for citizenship. We read statutes in a manner that avoids such an absurd result. *See Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 575 (1982) ("It is true that interpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available."); *see also Amalgamated Transit Union Local 1309 v. Laidlaw Transit Serv., Inc.*, 435 F.3d 1140, 1145 (9th Cir. 2006) (interpreting "not *less* than 7 days" in 28 U.S.C. § 1453(c)(1) to mean "not *more* than 7 days" to avoid an illogical result), *rehearing en banc denied*, 448 F.3d 1092 (9th Cir. 2006).

### III.  Historical Context Of § 315

**[6]** Our conclusion that § 315, when read in statutory context, does not apply to aliens discharged on the basis of alienage from voluntary training or service in the Armed Forces finds reinforcement in the historical context in which § 315 was enacted. Specifically, our interpretation is reinforced by the facts that (1) § 315's citizenship bar historically applied only to aliens exempted or discharged from the draft; (2) when used in the context of liability, the contemporaneous statutory meaning of "training or service in the Armed Forces" was the draft; (3) Congress narrowed the scope of § 315's predecessor to allow for the coexistence of a citizenship bar and accelerated naturalization on the basis of honorable military service.

### A.  Section 315 Historically Resided In The Selective Service Act, It Applied Only To Aliens Exempted Or Discharged From Liability For The Draft

We cannot ignore the fact that the citizenship bar now contained in § 315 was historically part of the selective service statutes and barred from citizenship only aliens exempted or discharged from liability for the draft on the basis of alienage. *See Davis*, 442 U.S. at 411; *Gorbach*, 219 F.3d at 1093.

In 1917 Congress authorized the President, at his discretion, to institute a military draft. *See* An Act to Authorize the President to Increase Temporarily the Military Establishment of the United States, Pub. L. No. 12, 40 Stat. 76 (1917) ("1917 Draft Act"). In 1918 Congress amended the 1917 Draft Act to (1) impose liability for the draft on so-called "treaty aliens;"[8] (2) allow treaty aliens to avoid liability for

---

[8]Gallarde is not a treaty alien. The United States never entered a treaty with the Phillippines providing for the reciprocal exemption of aliens from compulsory military service. *See* 8 C.F.R. § 315.4 (listing all such treaties).

the draft by withdrawing their intent to become citizens of the United States; and (3) bar any alien avoiding the draft in this manner from ever becoming a United States citizen. Likewise, the Selective Service Act of 1940, the Selective Service Act of 1948, and the Universal Military Training and Service Act of 1951 permitted an alien to avoid liability for the draft if *"prior to his induction*[9] . . . he has made application to be relieved from such liability." *See* Act to Amend the Selective Training and Service Act of 1940, Pub. L. No. 360, § 3, 55 Stat. 845 (1941);[10] Selective Service Act of 1948, Pub. L. No. 758, §§ 4,6,8, 62 Stat. 604, 606, 609, 614 (1948);[11] The Uni-

---

[9]*See infra,* section III.C (discussing the significance of this requirement). "Induction" refers only to entering military service or training as a result of the draft.

[10]In relevant part, the Selective Service Act of 1940, as amended, stated:

> Sec. 3. (a). Except as provided in this Act, every male citizen of the United States, and every other male person residing in the United States . . . shall be liable for training and service in the land and naval forces of the United States: Provided, That *any citizen or subject of a neutral country shall be relieved from liability for training and service under this Act if, prior to his induction into the land or naval forces, he has made application to be relieved from such liability* in the manner prescribed by and in accordance with rules and regulations prescribed by the President, *but any person who makes such application shall thereafter be debarred from becoming a citizen of the United States . . . .*

Act to Amend the Selective Training and Service Act of 1940, Pub. L. No. 360, § 3, 55 Stat. 845 (1940) (emphases added).

[11]In relevant part, the Selective Service Act of 1948 stated:

> Sec. 4. (a) Except as otherwise provided in this title, every male citizen of the United States, and every other male person residing in United States . . . shall be *liable for training and service in the armed forces* of the United States. Any citizen of a foreign country, who is not deferrable or exempt from training and service under the provisions of this title (other than this subsection), shall be relieved from *liability for training and service* under this title if, *prior to his induction* into the armed forces, he has made application to be relieved from such liability . . . *but any person who makes such application shall thereafter be barred from becoming a citizen of the United States.*

Selective Service Act of 1948, Pub. L. No. 758, §§ 4, 62 Stat. 604, 606 (1948) (emphases added).

versal Military Training and Service Act of 1951, Pub. L. No. 51, 65 Stat. 75-89 (1951). Like the 1917 Draft Act, exercise of the right to exemption from liability for the draft under these statutes barred the alien from ever becoming a citizen.

"The Immigration and Nationality Act of 1952 brought together in one statute the previously atomized subjects of immigration, nationality, and naturalization." *Minker*, 350 U.S. at 286. In the process, however, Congress separated the historically combined right of an alien to avoid the draft from the penalty for exercising that right; an alien's right to exemption remained in § 454 of the Universal Military Training Act. *See* Immigration and Nationality Act, Pub. L. No. 414, §§ 101, 315, 403(b), 66 Stat. 163, 169, 242, 280 (1952); 62 Stat. 604, 606, 609, 614 (1948).

Notwithstanding the fact that an alien's right to avoid liability for the draft and the penalty for doing so are no longer located in the same statute, we discern nothing in the text of § 315, the Immigration and Nationality Act of 1952, or § 453 of the Universal Military Training Act[12] suggesting Congress intended to expand the scope of § 315's citizenship bar beyond its historical scope.[13]

---

[12]In 1971, Congress amended 50 U.S.C. app. § 453 by adding a provision exempting non-immigrant aliens from selective service registration requirements and amended 50 U.S.C. app. § 454(a) by omitting any reference either to exemption of aliens or to ineligibility for citizenship if an alien is exempted from registration. *See* Act of Sept. 28, 1971, Pub. L. No. 92-129, § 101(a)(2), 85 Stat. 348.

[13]Although not essential to our decision, those interested in legislative history as an aid to statutory interpretation will find that § 315's limited legislative history supports the conclusion that Congress did not intend the Immigration and Naturalization Act of 1952 to expand the scope of the Selective Service Act of 1948's citizenship bar:

When the Nationality Act was enacted in 1940, the nature and scope of our possible participation in World War II could not be accurately anticipated and provided for. As a result, the Congress has found it necessary to enact certain amendments liberalizing

## B.   The Contemporaneous Meaning Of "Training Or Service In The Armed Forces"

"A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, *contemporary*, common meaning." *Perrin v. United States*, 444 U.S. 37, 42 (1979) (stating that the usage

---

naturalization privileges to those aliens who served in our armed forces during the war. Some of these privileges have now lapsed, and those aliens now serving in our armed forces do not enjoy the extremely liberal provisions which were enjoyed during the war period.

\*     \*     \*

The wartime provisions granting special privileges for wartime service have lapsed, but a new section, section 324A[, now § 329,] was added to the Nationality Act of June 1, 1948. This new section provides for naturalization of an alien who has served honorably in an active duty status during World War I or World War II. . . . It should be noted that wartime service must be in an active-duty capacity but that no particular or specified period of time is necessary.

\*     \*     \*

Another group of persons who are permanently barred from applying for citizenship is that group covered by the provisions of section 4(a) of the Selective Service Act of 1948. This section provides that an alien who, not being deferrable or exempt from training and service, applies for relief from such training and service prior to his induction is forever barred from applying for naturalization. The subcommittee feels that this provision is in line with the general concept of the Nationality Act and will recommend *that these provisions be incorporated in the proposed bill so that all requirements for naturalization may be found in one Act.*

S. Rep. No. 1515, 725 (Apr. 20, 1950) (emphasis added). Thus, § 315's legislative history indicates Congress intended simply to incorporate existing naturalization provisions related to military service into the Immigration and Nationality Act of 1952. Congress did not appear to have intended to expand the scope of a longstanding citizenship bar.

of the term at the time of its enactment is determinative). Our review of the 1917 Draft Act, the Selective Service Act of 1940, the Selective Service Act of 1948, and the Universal Military Training and Service Act of 1951 leads us to the conclusion that the contemporary meaning of "training or service in the Armed Forces," as used in § 315(a), included only compulsory training or service in the Armed Forces pursuant to the draft.

As an initial matter, "liability" appears only in § 315(b), the subsection of § 315 addressing means of proof. *See* 8 U.S.C. § 1426(b). "Liability" in § 315(b), however, is modified by "such" and, therefore, refers to "training or service in the Armed Forces" in § 315(a), the subsection of § 315 containing the citizenship bar at issue in this case. *See* 8 U.S.C. § 1426(a); *see also* Blacks Law Dictionary 1473 (8th ed. 2004) (defining "such" as "[t]hat or those; having just been mentioned"). Accordingly, a "liability" requirement has properly been read into § 315(a). *See* 8 C.F.R. § 315.2(b)(1) (excepting aliens not liable for military training or military service from § 315's citizenship bar); *In re Wendt*, 300 F.Supp. at 727 (excepting from § 315's citizenship bar alien who was not liable for the draft when he applied for a draft exemption) (following *McGrath v. Kristensen*, 340 U.S. 162, 172 (1950) (" 'Such application'[, in Section 4(a) of the Selective Service Act of 1948,] refers to an application to be relieved from 'such liability.' As there was no 'liability' for service, his act in applying for relief from a nonexistent duty could not create the bar against naturalization.")).

The 1917 Draft Act distinguished between voluntary and involuntary military service, using "liability to military service," "liable," "exempt," and "exemption" when referring to involuntary military service pursuant to the draft and "enlistment" or "voluntary enlistment" when referring to voluntary military service. *See* 40 Stat. at 77-78.

Likewise, the Selective Service Act of 1940 distinguished between voluntary and involuntary military service, using the

language "liable for training and service" and "liability to serve" when referring to involuntary military service. *See* Selective Service Act of 1940, Pub. L. No. 783, §§ 3, 5, 54 Stat. 885, 887 (1940).

The Selective Service Act of 1948 and the Universal Military Training and Service Act of 1951 also used similar language, distinguishing between voluntary and involuntary military service by using "inducted" and "liability for training and service" when referring to the draft and "enlist" when referring to voluntary service and barred only aliens who avoided the draft on the basis of their alienage from becoming United States citizen. *See* Selective Service Act of 1948, Pub. L. No. 758, §§ 4,6,8, 62 Stat. 604, 606, 609, 614 (1948); *see also* The Universal Military Training and Service Act of 1951, Pub. L. No. 51, 65 Stat. 75-89 (1951) (amending the Selective Service Act of 1948).

Finally, 10 U.S.C. § 1 used "liable" and "liable to perform military duty" to describe men subject to the draft:

> **National Forces; persons *liable* to perform military duty.**
>
> All able-bodied male citizens of the United States, and persons of foreign birth who have declared their intention to become citizens of the United States under and in pursuance of the laws thereof, between the ages of eighteen and forty-five years, are declared to constitute the national forces, and, with such exceptions and *under such conditions* as may be prescribed by law, *shall be liable to perform military duty* in the service of the United States.

10 U.S.C. § 1 (1950) (italics added) (Apr. 22, 1898, ch. 187, § 1, 30 Stat. 361). "Such conditions," thereunder, were proscribed by the Universal Military Service and Training Act of

1951, which defined liability for the draft. *See* 50 U.S.C. app. § 454 (a) (1951).

Accordingly, when tied to the concept of liability, the contemporaneous statutory meaning of "training or service in the Armed Forces" included only compulsory training and service pursuant to the draft.

### C. Congress's Narrowing Of The 1917 Draft Act's Citizenship Bar

Under the 1917 Draft Act, aliens were not required to exercise their right to exemption from the draft "prior to induction." *See* 40 Stat. at 76. Accordingly, the 1917 Draft Act's citizenship bar applied to aliens exempted or discharged[14] from liability for the draft at any time. *Id.*

On September 16, 1940, Congress replaced the 1917 Draft Act with the Selective Service Act of 1940. *See* 54 Stat. 885. As initially enacted, the Selective Service Act of 1940 did not grant aliens a right to exemption from liability for the draft or contain a citizenship bar. *Id.*

On October 14, 1940, Congress enacted the Nationality Act of 1940, providing therein for accelerated naturalization on the basis of a three-year period of honorable military service. *See* The Nationality Act of 1940, Pub. L. No. 853, § 324, 64 Stat. 1137, 1149 (1940). Nothing in the Nationality Act of 1940 deprives an alien discharged under honorable conditions on the basis of alienage from pursuing accelerated naturalization thereunder.

---

[14]The Draft Act of 1917 used "discharge" and "discharging" when referring to relief from liability for the draft. *Id.* ("[T]he President is hereby authorized to exclude or *discharge* from said selective service draft . . . persons of the following classes: . . . *discharging* individuals or classes of individuals from the selective draft[.]") (emphasis added).

On December 20, 1941, Congress amended the Selective Service Act of 1940 to permit an alien to avoid the draft by applying for an exemption "prior to induction" and to impose a citizenship bar upon any alien making such an application. *See* 55 Stat. at 845. By limiting the Selective Service Act of 1940's citizenship bar to aliens who apply for exemption "prior to induction," Congress preserved accelerated naturalization under the Nationality Act of 1940 for aliens who entered the Armed Forces, later to be separated from military service under honorable conditions on the basis of alienage.[15]

Three months after the attack on Pearl Harbor, Congress amended the Nationality Act of 1940 to provide for accelerated naturalization on the basis of even one day of honorable wartime military service. *See* War Powers Act of 1942, Pub. L. No. 507, § 701, 56 Stat. 176, 182 (1942). Congress, however, expressly denied this form of accelerated naturalization to any alien discharged on the basis of his alienage by stating therein that: "The provisions of *this title*[, the War Powers Act of 1942,] shall not apply to . . . any person who . . . is discharged therefrom on account of alienage[.]" 56 Stat. at 183 (emphasis added). Significantly, because this disqualification was limited to the loss of eligibility under "provisions of this title," an alien discharged on the basis of alienage could still seek accelerated naturalization under the Nationality Act of 1940 on the basis of a three-year period of honorable military service or, if a legal permanent resident, on the basis of five-years of continuous residence. In short, Congress created a two-tiered system rewarding honorable military service with accelerated naturalization depending on the length of such service, the peace or war time nature of such service, and whether such service was terminated on the basis of alienage.

---

[15]The Selective Service Act of 1948 and the Universal Military Training and Service Act of 1951 likewise barred from citizenship only those aliens who applied for an exemption "prior to induction." *See* 62 Stat. 604; 65 Stat. 75.

**[7]** We discern nothing in the Immigration and Nationality Act of 1952 suggesting Congress intended to disturb this system. Indeed, we conclude that in enacting §§ 315, 328 and 329 of the Immigration and Nationality Act of 1952, Congress intended to continue that system.

## IV.   No Risk Of An Exodus of Aliens From The Armed Forces

The Government contended at oral argument that adopting the interpretation of § 315 advanced by Gallarde would have grave consequences. Specifically, the Government contended that interpreting § 315's citizenship bar not to apply to aliens exempted or discharged from voluntary military service would permit aliens unilaterally to terminate their enlistment contracts without consequence. Not so. Aliens do not possess a right to a discharge, based on alienage, from voluntary military service.[16] Rather, certain aliens may apply for a discretionary administrative discharge on the basis of alienage.

**[8]** Congress granted the Secretary of Defense authority over the administrative separation of enlisted service members. *See* 10 U.S.C. § 1169. The Secretary of Defense delegated this authority to the Secretaries of the individual military services. *See* Department of Defense Directive 1332.14 (November 21, 2003). Presently, only the United States Navy provides for separation on the basis of alienage. *Compare* Naval Military Personnel Manual 1910 (April 1, 2004), *with* Army Regulation 635-200; Marine Corps Order P1900.16F Ch 1; and Air Force Instruction 36-3208 (July 9, 2004).[17] Although an alien serving in the United States Navy

---

[16]As previously noted, § 315 merely imposes a bar for the exercise of such a right, it does not confer that right.

[17]These regulations include numerous grounds for administrative separation from military service that are not dependent upon citizenship, including hardship, pregnancy, and early release to pursue education. *See, e.g.*, MILPERSMAN 1900-100.

may apply for an administrative discharge on the basis of alienage, he has no right to such a discharge. *See* Naval Military Personnel Manual 1910-127.[18] Indeed, the Navy denied Gallarde's first request for an early discharge under what is now Naval Military Personnel Manual 1910-127 (3)(b)(3). Accordingly, contrary to the Government's fears, our holding today does not give alien servicemen the unilateral right to terminate voluntary enlistment contracts. Rather, an alien's request for an administrative discharge on the basis of alienage, like the request of a citizen applying for a hardship or pregnancy discharge, may be denied.[19]

---

[18]In relevant part, Naval Military Personnel Manual 1910-127 states:

3.   Policy

    a.   A member who is an alien may be separated upon member's request.

    b.   The request will normally be denied when a member

*      *

     (3)   is serving in a rating, Navy enlisted code, occupational field, or military occupational specialty determined to have significant personnel shortages.

*      *      *

    c.   Exceptions to the conditions described above may be made . . . if the request demonstrates overriding and compelling factors of a personal need justifying separation.

Naval Military Personnel Manual 1910-127 (April 1, 2004).

[19]Judicial review of the denial of an administrative discharge is "the narrowest review known to law." *Taylor v. Claytor,* 601 F.2d 1102, 1103 (9th Cir. 1979) (quoting *Sanger v. Seamans*, 507 F.2d 814, 816 (9th Cir. 1974); *see also Roby v. Dep't of the Navy*, 76 F.3d 1052, 1056 (9th Cir. 1996) ("The military's considered professional judgment is not lightly to be overruled by the judiciary. Our review, therefore, is as deferential as our constitutional responsibilities permit." (internal quotation marks, citations, and ellipsis omitted)).

**Conclusion**

For the foregoing reasons, we hold that, when read with a view to its place in the statutory scheme and in its historical context, § 315 applies only to aliens exempted or discharged on the basis of alienage from compulsory training and service in the Armed Forces. Under *Chevron*, such a determination ends our inquiry; we "must give effect to the unambiguously expressed intent of Congress." *Brown & Williamson Tobacco*, 529 U.S. at 132. Accordingly, we **REVERSE** and **REMAND** for further proceedings consistent with this opinion.